## W. H. LIPSCOMB *v.* STATE OF MISSISSIPPI.*

| | |
|---|---|
| 75 | 559 |
| 76 | 140 |
| s76 | 236 |
| 75 | 559 |
| 77 | 762 |
| 75 | 559 |
| 79 | 319 |
| 79 | 320 |
| 75 | 559 |
| 84 | 196 |
| 75 | 559 |
| 87 | 304 |
| 75 | 559 |
| f94 | 123 |

1. DYING DECLARATIONS. *Rules governing.*

   The following rules governing the admission of evidence of dying declarations are recognized:

   (*a*) They must have been made under the realization and solemn sense of impending death;

   (*b*) They must have been the utterances of a sane mind;

   (*c*) They must be restricted to the homicide and the circumstances immediately attending it, and forming a part of the *res gestœ ;*

   (*d*) A declaration, or part of it, is not admissible unless it would be competent and relevant if it were the testimony of a living witness; and,

   (*e*) Great caution should be observed in the admission of dying declarations, and the rules which restrict their admission should be carefully guarded.

2. SAME. *Admissibility determined by court. Degree of proof.*

   As a preliminary question, the admissibility of a dying declaration is determined by the court, and the degree of proof required to establish that the declarant realized he was *in extermis* is such as to exclude all reasonable doubt.

3. SAME. *Whether declaration one of fact or opinion. Its form not conclusive. Degree of proof.*

   The competency of a dying declaration, whether one of fact or opinion, is a question of fact to be determined by a judicial interpretation of the meaning of the declaration, as indicated by its terms, viewed in the light of surrounding circumstances; the form of the declaration—the literal sense of the words used—is not necessarily controlling. If it be a reasonable construction that a declaration is one of fact, it ought to be so adjudged.

*The syllabus in this case, prior to publication, was submitted to each of the judges who presided in the cause, and met their approval.—REPORTER.

Syllabus.

4. SAME. *Objections to.*

A general objection to evidence of a dying declaration should be overruled if any part of the declaration be admissible. *Merrill* v. *State*, .58 Miss., 66; *Field* v. *State,* 57 Miss., 474, distinguished and explained.

5. SAME. *Evidence; source of; weight of.*

An instruction which points out, by way of precaution, the inherent qualities which, by law, pertain to dying declarations, and which refers to the source, rather than the matter, of the evidence, is not objectionable as being upon the weight of evidence. There is a distinction between the source of evidence and its weight.

6. SAME. *Case at bar.*

The dying declaration in this case was in these words: "He [meaning the declarant] said he had been dead, and that he was going to die, and the good Lord had sent him back to tell me [the witness] that Dr. Lipscomb had poisoned him with a capsule he gave him that night, and Guy Jack had his life insured, and had hired Dr. Lipscomb to kill him." The objection to the evidence was a general one.

Judges WHITFIELD and THOMPSON held, even had specific objection been made, that the part of the declaration in these words, "He said . . . that Dr. Lipscomb had poisoned him with a capsule he gave him that night," was admissible, and was the statement of a fact. Judge MAGRUDER thought the whole inadmissible, and that the part last quoted was the expression of an opinion.

7. PRACTICE. *Jury's right to have papers.    Code* 1892, § 730.

By the terms of the statute, code 1892, § 730, all papers read in evidence on the trial of any cause may be carried from the bar by the jury, and the court should not cause such papers to be withheld from them.

8. CRIMINAL LAW. *Reasonable doubt.    Instruction.*

An instruction in a criminal case which authorizes conviction upon evidence which engenders "full conviction" of guilt, does not require proof beyond all reasonable doubt, and is erroneous.

Judges MAGRUDER and THOMPSON held that the instruction in this case to that effect was reversible error. Judge WHITFIELD thought the instruction was erroneous, but that it did not constitute reversible error under the facts of the case.

9. Appellate Practice.    *When error reversible.*

Upon appeal in a criminal case, if it be found that the trial court committed error against appellant, and that the error was calculated to and probably did produce the result evidenced by the judgment appealed from, the case should be reversed.

Judges Magruder and Thompson thought this rule should be applied and a new trial granted, while Judge Whitfield was of opinion that the verdict in the case was not caused, or contributed to, by the error of the court below, but was clearly proper under the law applicable to the case and the competent testimony therein, and hence that the rule had no application.

10. Same.    *Motion to vacate judgment.    Suggestion of error.*

Upon a motion to vacate a judgment of reversal and substitute therefor one of affirmance, on the ground that no two members of the court agree on a common ground of reversal, the question whether the original holdings of the judges were right or wrong cannot be considered; such question is proper to be raised by suggestion of error.

From the circuit court of Kemper county.
Hon. G. B. Huddleston, Judge.
The facts are stated in the opinions.

*J. H. Currie,* for appellant.

The objection to this remarkable dying declaration could not have been more specific than it was.    The declaration consists of one thing.    It relates to the same subject, was made at the same time, and therefore it could not be separated.    It was impossible to cut off a part of the poisoned meat and let another part go to the jury.    The whole of what the man stated was proper to be considered or none.    It will not do in a case like this to pick out a word or sentence which purports to state an isolated fact and leave out the rest.    It is absurd and improper to consider even the testimony of the holy scriptures by such a rule, much less human testimony.    It is a fixed rule that the whole of a confession must be introduced, if any part is offered, and it is an injustice to the defendant to allow a part to be offered and to exclude the other, which would shed light on the whole.

In the case of *Bell* v. *State*, 72 Miss., 507, this court used the following language, which applies with peculiar force in this connection: "To give to the words which the observation of mankind teaches are frequently used in a different sense, an inflexible significance, even though it be a natural one, would be to do violence to the plain dictates of common sense, and would often result in serious injustice. Words are but the exponents of thought, and the effort must be to determine whether in the particular instance the thought suggested by their use was that of the speaker." In view of this strong statement, and in the light of common sense, we submit that it is wholly immaterial that this alleged declaration does not purport on its face to be the expression of an opinion that Guy Jack had hired the defendant to poison the deceased. It must be perfectly apparent to an unbiased mind that this unfortunate man in his dying moments never intended to state positively that Dr. Lipscomb had poisoned him or that Jack had hired him to kill him. He did not intend to be so understood, and it is the rankest injustice, not only to the defendant, but to the dying man himself, to attempt to give to his words, by reason of any literal interpretation, a significance which he never intended them to have. Does the court, for one moment, suppose that this man, who was about to be ushered into the presence of his Maker, intended that his words should be construed to mean that he had personally seen the risen Lord, and that he had been sent back with a message, or that he knew that Dr. Lipscomb had poisoned him because Guy Jack had hired him to do so? Now, it is an established rule that a dying declaration must be confined to facts, and that they must not be hearsay, must not be based upon opinion or speculation, but must be competent as evidence. They must be such as the declarant would be permitted to testify to if alive. We would ask the court if it could be possible to conceive that this unfortunate man could be brought back to life and placed upon the stand as a witness and sworn, whether he could have been convicted of perjury in making the

statements attributed to him.  Of course he could not.  .Any jury would say, any court would say, that he did not intend to be understood as stating facts positively and as of his own knowledge, but that he was giving merely his opinion; that he had such opinion, and whether it was reasonable or not is wholly immaterial.  He merely meant to say, looking backwards at all the facts, that it was perfectly apparent to him that these things were true; that he was morally convinced they were true. He wishes you to be impressed with that fact, but not as a statement of a positively known fact, because the answer to all this is that he would not have taken the medicine if he had known what counsel now seek to have him state as a positive fact.

Opposing counsel refer to the case of *Walker* v. *State*, 39 Ark., 221, but if the court will read *Jones* v. *State*, 52 Ark., 345, it will be seen that the case referred to was practically overruled, and the only sensible rule on the subject is announced in the latter case, that ''a mere expression of opinion by the dying man is not admissible as a dying declaration, and it is immaterial whether the fact that the declaration is a mere opinion appears from the statement itself or from other undisputed evidence, showing that it was impossible for the declarant to have known the facts stated.''

We also refer the court to the case of *Berry* v. *State*, 63 Ark., 382, which is directly in point, and where an opinion very much more positive than the one in question was held to be incompetent.  There no question was raised as to a message from the Lord, and the like, but the man's inference from the fact that the whisky he had voluntarily drunk was poisoned, and had killed him, was excluded.  We also refer to the splendid opinion of the supreme court of North Carolina, in the case of *State* v. *Williams*, 67 N. C., 12, and to *Binns* v. *State*, 46 Ind., 31.  These cases lay down and discuss fundamental rules which are applicable here, and before which this alleged dying declaration must be dissipated as the mists before the

rising sun.   No case cited by opposing counsel is like the one
at bar.   The only case like it in its essential features is that of
*Berry* v. *State*, 63 Ark., above referred to.   Considering the
gravity of the question, the solemnity of the occasion, and the
tremendous importance of this question, not only to the defend-
ant, whose life is at stake, but to the cause of human liberty,
we wish to enter the most earnest and solemn protest against
the admissibility of such testimony as is relied upon here, to
take away appellant's life.   The idea of hanging a man on this
kind of testimony is to us perfectly horrible.   It is apparent
what a tremendous weight it had.   Surely, surely it is not
proper, even if some words or sentence might have been selected
and held as competent (which we deny) to allow the whole case
to be made out, the motive to be established, by such testimony,
admitted in this way.

We call the attention of the court to the manifest errors in
the instructions given for the state.   We also call attention to
the manifest error in excluding from the jury the written re-
port of the autopsy.   A great deal of testimony was taken as to
this autopsy, and, after being explained and re-explained, the
defendant desired the paper itself to be taken out and considered
by the jury, but this was refused, and in positive violation of
the plain statute on the subject.   Code 1892, § 730.

*W. R. Harper*, on the same side.

The court below erred in refusing to allow the jury, at de-
fendant's request, to carry out with them the written report of
the physicians who held the autopsy, the same having been ad-
mitted in evidence by the court.   The court below failed to
avail itself of the evidence of the negro who was present at the
time the alleged dying declaration was made.   This was error.
*Bell* v. *State*, 72 Miss., 512.   The declarant must have been
in such a state of mind as to have had a clear understanding of
what he was saying.   *Binfield* v. *State*, 15 Met., 484.   The
declarations of one deprived of full consciousness are not ad-

missible. *Mitchell* v. *State*, 5 Ga., 125; *McHugh* v. *State*, 31 Ala., 317. A mere expression of opinion is inadmissible as a dying declaration, and it is immaterial whether the fact that the declaration is mere opinion appears from the statement itself or from evidence showing that it was impossible for the declarant to have known the fact stated. *Jones* v. *State*, 52 Ark., 345; *Binns* v. *State*, 46 Ind., 311; *State* v. *Arnold*, 13 Ire. L., 184; *State* v. *Parker*, 92 Mo., 312. If the declarant's due appreciation of impending death can be determined from the statement itself, his mental state and capacity to testify may be determined from the same evidence. Thus tested, it seems clear that declarant was in such a mental condition as to render his statement incompetent. It seems clear that those words of his, "I have been dead, and the good Lord sent me back to tell you," are the expressions of a mind already torn from its moorings; that they are the result of hallucination, of delirium, and unfit for evidence. A healthy, sane, conscious mind would not, in this day and time, undertake to state, as a fact, that it had been dead, and had returned to deliver a message. The declaration does not purport to state facts nor even to express an opinion, but purports to be merely a message sent by the Lord through the agency of declarant. Such a statement made by a witness on the stand would be objectionable as being mere hearsay.

The statement or declaration is not separable. It is so linked and connected together that it must stand or fall as a whole. To separate it would be to put into the mouth of declarant a statement that he never made. Such a garbling is not permissible. Statements are only separable when they refer to different subjects. All or none that is said about the same subject must be admitted.

The ninth instruction given for the state is erroneous. It authorized a verdict against appellant on testimony which engenders "full conviction" of guilt, and does not require that appellant's guilt should be established beyond a reasonable

doubt. This is in the face of repeated decisions of this court. This error is not cured by other instructions, but when read into the other instructions, tend to vitiate them, in that testimony engendering " full conviction " is thus made sufficient to establish guilt throughout.

The fifteenth, sixteenth and seventeenth instructions refused defendant all bear upon the dying declaration, and ought to have been given. If a judge be permitted to caution the jury about the danger of convicting on circumstantial evidence, there is no reason why they may not be cautioned as to dying declarations. The dying declaration in this case is no part of the *res gestœ.* It was made hours after the last wrongful act of Lipscomb, and hence comes within the rule laid down in *Mayes* v. *State,* 64 Miss., 329; *King* v. *State,* 65 Miss., 576; *Field* v. *State,* 57 Miss., 474.

*J. A. P. Campbell, John R. Dinsmore,* and *Wiley N. Nash,* attorney-general, for appellee.

Every part of the declaration of the dying victim of poison was of a fact. Whether all these facts are admissible as evidence under settled rules, is the question. There surely can be none as to that fixing guilt upon Lipscomb as the poisoner, any more than if it was that he had shot or stabbed the declarant. Whether the part which states what impelled Lipscomb to poison him is competent as showing the motive for the crime, is not so clear, we admit. We submit that it is competent, as a narrative of all the circumstances of a single transaction, conceived in sin and consummated by iniquity, in the death of the party insured. Murder by poison is *sui generis,* and unlike that by shooting or stabbing or clubbing. The poisoner is not usually present with his victim. His method is secret, and at a distance usually, and his victim should be allowed to relate all that connects the guilty agent with his secret crime. If Jack and Lipscomb had been present, and the latter had incited the former to kill Stewart, because he had a policy of insurance on his life, and Lipscomb had shot his victim, a dying declaration of

all that occurred would have been inseparable and competent. The concoction of the scheme to poison was at a distance, but the part each actor performed is as much part of the *res gestæ* as if Jack and Lipscomb together had announced the facts, and Lipscomb had shot or cut Stewart so as to cause death.

Cases supporting admissibility of dying declarations, over the objection that they were not facts but opinions: *Payne* v. *State*, 61 Miss., 161, "He shot him without any cause," held not an opinion but statement of a fact. Citing, with approval, *Wroe* v. *State*, 20 Ohio St., 460, where the declaration was, "It was done without any provocation on his part," and this was held admissible. *Powers* v. *State*, 74 Miss., 777, cites and approves *Payne* v. *State*. *Sullivan* v. *State*, 102 Ala., 135, the declaration, "He cut me for nothing; I never did anything to him," held to be a collective fact, and admissible, while "I pray God to forgive him!" as inadmissible. The objection was specific in this last case, and was held good. *Jordon* v. *State*, 81 Ala., 20, the words were, "Jule shot me, and Handy cut me, and all for nothing," and were held to be competent as facts. *Boyle* v. *State*, 105 Ind., 469, the question was: "What reason, if any, had the man for shooting you?" The answer was, "Not any that I know of; he said he would shoot my damned heart out." And this was held admissible. This case is reported in 97 Ind., 322, where the holding was the same. *People* v. *Farrar*, 77 Cal., 1, question: "What did he shoot you for?" Answer, "He had no reason whatever." Held, probably not incompetent, and, as specific objection was not made to this part, there was no error. *People* v. *Taylor*, 59 Cal., 640, illustrates, in a case of poisoning, the sort of opinion which is not competent. *Walker* v. *State*, 39 Ark., 221, the declaration was, "Nick Walker shot me." It was proved that the declarant was shot through an augur-hole by night. The evidence of the dying declaration was held to be competent, and it was to be dealt with by the jury. *State* v. *Clemens*, 51 Iowa, 274, the declaration was, "Ed Clemens shot

me; ain't I right?" Held competent, the court saying that testimony is to be excluded "only when the declaration shows, upon its face, that it is a mere opinion;" that it is for the jury to say, on the whole evidence, if deceased intended to state a fact. *State* v. *Saunders*, 140 Ore., 300, the declaration was, "He shot me down like a dog," and it was held competent. *Jones* v. *State*, 52 Ark., 345: "If it is possible for the declarant to know the truth of what he states, it is competent." *State* v. *Ferrell*, 12 Richardson (S. C.), 320, held, declarations of the person poisoned, which pointed out the prisoner as the party who prepared the poison, admissible. The declaration narrated the circumstances, showing how it was brought about. *State* v. *Benton*, 24 S. C., 185, cites and approves *State* v. *Ferrell*, and holds a declaration by decedent that the accused had passed him on the road before the homicide, admissible as pointing to the prisoner. *Richards* v. *State*, 82 Wis., 172, held competent a declaration that declarant "was stabbed without provocation." *Brotherton* v. *People*, 73 N. Y., 159: Deceased at first did not recognize the prisoner, who was disguised, but said, "when he [the latter] drew his pistol and 'commenced his pranks,' he knew it was the prisoner." Held, not an opinion, and admissible. *People* v. *Green*, 1 Denio, 614, case of wife poisoning by husband, and her dying declarations about it were held properly admitted. *People* v. *Green*, 1 Parker C. Rep., 11, decedent gave an account of her poisoning by her husband, and it was held to be admissible, and he was convicted and executed. *Roberts* v. *State*, 5 Tex. Ct. Ap., 141, the declaration was, "Sam Roberts killed me for nothing." Held, a statement of fact, and not an opinion, and admissible. *State* v. *Arnold*, 13 Ired., 184, declaration was, "A. B. has shot me or killed me." The court said: "It must be presumed that the declarant intended to state a fact, and not an opinion; that it did not appear that deceased knew, or could know, the facts, seems to go to the credit, and not the competency, of the declarations. As they purport in themselves to declare the facts, the court was

bound to submit them to the jury." Suspicion of defects in party's means of knowledge was said to be not a ground for exclusion of the declarations. *White* v. *State*, 30 Tex. Ct. Ap., 652, held that the fact that dying declarations are inconsistent and partly untrue is not a ground for their exclusion. *State* v. *Gile*, 8 Wash., 12, the declaration, they "butchered me," was held admissible as a statement of fact. *Hackett* v. *People*, 54 Barb., 370, illustrates the distinction between what is *res gestæ* and what is not, as applied to dying declarations. "That the boys of the accused had followed and clubbed deceased immediately preceding the attack by the accused, was admissible, while a declaration of previous threats by the accused were excluded as incompetent." *State* v. *Shelton*, 2 Jones (N. C.), 360, approves the admission of a full narration of the whole fight; considering all the circumstances as constituting but one act, all were properly admitted, otherwise not. *Commonwealth* v. *Matthews*, 89 Ky., 287: A declaration that the shooting was an accident was admitted as a fact. *State* v. *Saunders*, 92 Ky., 135, makes the test of admissibility, anything the declarant could testify to if alive and on the stand, as to the circumstances of the homicide. *Wilkerson* v. *State*, 91 Ga., 729, holds competent "all relevant facts embraced in the *res gestæ* of the homicide, whatever the witness, if on the stand, would be permitted to relate."

But it is not necessary to hold that the declaration as to the insurance policy and Guy Jack hiring Lipscomb to do the deed is competent, for the objection of the defendant was not to this particular part, but it was leveled against the entire dying declaration. There was no separation, and no specific objection to the part relating to the insurance and hiring, and, like a demurrer to a pleading which is good in part, it properly failed. Our own cases require objections to evidence to be specific, whenever it is possible to obviate the objection, if particular attention is called to it. It was an easy matter to separate here, and exclude all the dying declaration except the substantive

and fatal fact that Dr. Lipscomb poisoned or killed the declarant, but it was preferred to make a general objection to the whole declaration in the hope that the incompetent part, if any, would cause all to be excluded instead of the competent part making all admissible.    Astute counsel saw that to exclude the part relating to Jack and the hiring, would leave in the damning fact that Lipscomb killed Stewart by a capsule, and that would likely insure a conviction, and it was resolved to object to the whole declaration, in the hope that the admission of part would be held to be error.

*Necessity for specific objection to illegal part :*  We cite, first, *Reynolds* v. *State*, 68 Ala., 502, which holds a general objection not good to a dying declaration some part of which was incompetent.    *Archibald* v. *State*, 122 Ind., 122, is to the same effect. *Brown* v. *State*, 52 Ala., 345, decides that an objection to the whole evidence, some of which is good, may be properly overruled.    In *State* v. *Norton*, 121 Mo., 537, the dying declaration was in writing, and parts of it were not admissible, and it was held a general objection to the whole by counsel was properly overruled.    *State* v. *Black*, 42 La. Ann., 861, holds a dying declaration must go to the jury as an entirety, citing 32 La. Ann., 1086, where it is so held, and approved the admission of the declaration, " I have been shot by a man who I had no reason to suspect a shot from; for that he ought not to have shot me; he had no reason to shoot me."    In the case cited in 32 La. Ann., 1086, objection was made to the part that was illegal, and it was overruled and all allowed to go to the jury, and this was approved.  *Johnson* v. *State*, 17 Ala., 618: Affidavit of deceased containing facts and belief was admitted, and the jury instructed to disregard the statement of belief, and this was held proper, but the judgment was reversed because the trial judge did not, by instruction, exclude enough.  *People* v. *Farmers*, 77 Cal., 1, held that specific objections should be made to the parts which are incompetent.    96 Tenn., 209, App. 213, 214.  *Brown* v. *State*, 72 Miss., 95; *Mills* v. *Smith*, 69

Miss., 299; *Decell* v. *Lewenthall,* 57 Miss., 331, are some cases in our state on the subject of specific objection to evidence.

The following are a few of the cases, civil and criminal, which hold that where the objection is to the whole evidence, some of which is competent and some not, it may be properly overruled: 1 Peters, 328, 338; 111 Ala., 34; 87 Ala., 99; 88 Ala., 8; 85 Ala., 198; 84 Ala., 279; 85 Ala., 192; 82 Ala., 25; 72 Ala., 92; 66 Ala., 129; *Id.,* 422; 63 Ala., 307; 56 Ala., 379; 93 Va., 279; 90 Tenn., 548; 77 Ga., 322; 74 Iowa, 324; 62 Mich., 205; 103 N. Car., 337; 51 N. J. R., 37; 13 Wash., 78; 57 Kan., 474; 54 Kan., 421; 121 Ind., 1; 122 Ind., 122; 36 Kan., 488; 8 Kan., 608; 21 Col., 435; 18 Col., 153; 38 U. S. Ct. App., 394, s. c. 72 Fed. Rep., 885; 62 Minn., 241; 42 Minn., 245; 35 Minn., 170; 100 N. Car., 161.


*Cochran & Bozeman,* on same side.

The admission of the dying declaration of Stewart as evidence is assigned as error, and, as we appreciate it, this assignment is the real battle ground of this appeal. If this evidence was competent, we assume that the judgment of the court below must be affirmed. We shall not discuss the elementary principles of law governing the admissibility of dying declarations, because we do not consider it necessary. According to Mr. Starkie, ''the principle which this exception stands upon is clear and obvious. It is presumed that a person who knows that his dissolution is fast approaching, that he stands on the verge of eternity, and that he is to be called to an immediate account for all that he has done amiss, before a judge from whom no secrets are hid, will feel as strong a motive to declare the truth and to abstain from deception, as any person who acts under the obligation of an oath.'' 1 Starkie Ev., 32. And Shakespeare seems to have entertained the same view when he put the sentiment into the mouth of the wounded Melun, who, finding himself disbelieved while announcing the intended treachery of King Louis, exclaims:

Have I not hideous death within my view,
Retaining but a quantity of life,
Which bleeds away, even as a form of wax
Resolveth from his figure 'gainst the fire?
What in the world should make me now deceive,
Since I must lose the use of all deceit?
Why should I then be false, since it is true
That I must die here, and live hence by truth?
                                    —*King John*, *Act V.*, *Scene 4.*

We insist that Stewart's dying declaration is a clear-cut statement of facts on its face. His statement that he had been dead is wholly immaterial. He had just recovered from a state of unconsciousness, immediately following the second convulsion, and he had certainly been very near death's door. The declaration that the Lord had sent him back, is also immaterial, because the courts do not undertake to fathom the mysterious purposes of an allwise Providence. Any man who recognizes the providences of God may well hesitate before he rashly contends that Stewart was not moved by him who loves justice more than man, to make the dying declaration, in order that his murderers might be surely punished. Stewart said "that Dr. Lipscomb had killed him; had poisoned him with a capsule that he gave him that night." Clearly, on its face it is the statement of a fact, and Stewart knew that appellant had poisoned him; he knew that appellant gave him the capsule, and he knew that he was dying from the effects of the poison that he had taken. It is illogical to argue that Stewart did not know that the poison was killing him, merely because he could not see its effects upon his vital organs, and because he had never been poisoned before. Suppose Stewart had seen appellant draw a revolver, level it at him, and heard the click of the trigger, and saw the smoke from the barrel of the pistol, and had immediately felt great bodily pain, surely no one could argue that he would not know that appellant had shot him. He did not see the bullet when it left the barrel of the pistol, nor when it entered his body, still he felt its death-dealing force and effect, and knew, just as certainly as man can know any-

thing, that appellant had shot him. Again, suppose that Stewart had not felt the effects of fire, and placed his hand upon a hot stove in which he saw no fire, and that he immediately exclaimed that his hand was burned, would any man for a moment contend that he would not know that his hand was burned by fire? Why could Stewart know any more certainly that he was dying from the effects of a pistol bullet, which he did not see enter his body, than he could have known that he was dying from the effects of a strychnine bullet, which he received from the hand of appellant, and which he had, with his own hand, place in his body? His general knowledge of the effect of strychnine was just as full and accurate as his knowledge of the effect of a pistol ball on the human body. It is worse than idle to argue that his statement that appellant had poisoned him was only his opinion, when the record proves that it was a fact that he was poisoned, and that the chemists found in his body enough strychnine to kill three or four men.

He further stated that Guy Jack had his life insured. It was the statement of a woeful and momentous fact. Guy Jack held insurance on his life to the tune of twenty thousand dollars, and this awful and wicked fact was the proximate cause of Stewart's horrible death. Stewart further stated that "Guy Jack had hired Lipscomb to kill him." The argument of appellant was, and is, against the competency of this statement, that, if Stewart had known that Guy Jack had hired the appellant to kill him, he would not have taken the capsule. The argument is not sound, and is illogical. Of course, if Stewart had known that Lipscomb intended to poison him, he would not have taken the capsule, but he did not know it until after he had taken it, and the real meaning and significance of appellant's conduct, and his conferences with Stewart and Guy Jack in Jack's store, only a few hours before he died, were not known to him until he was in the throes of death. If, upon any view of the evidence, it is possible for the declarant to know the truth of what he stated, his declaration being otherwise competent, should be

received and considered by the jury in the light of all the evidence. *Payne* v. *State*, 61 Miss., 167; *State* v. *Black*, 42 La. Ann., 861; *People* v. *Beverly*, 66 N. W. Rep. (Mich.), 379; *Curtis* v. *State*, 14 Lea, 501; *Battle* v. *State*, 74 Ga., 101; *Sullivan* v. *State*, 102 Ala., 135; 15 So. Rep., 264; *State* v. *Gile*, 8 Wash., 12; *Powers* v. *State*, 74 Miss., 777; *State* v. *Poll*, 1 Hawks (N. C.), 442; 9 Am. Dec., 655; *Jordan* v. *State*, 81 Ala., 20; *Wroe* v. *State*, 20 Ohio St., 460; *Boyle* v. *State*, 105 Ind., 469.

Argued orally by *J. H. Currie* and *W. R. Harper*, for appellants, and by *J. B. Cochran, J. A. P. Campbell, John R. Dinsmore*, and *W. N. Nash*, attorney-general, for the state.

MAGRUDER, Special J., delivered the following opinion, favoring a reversal of the judgment appealed from:

At the March term, 1897, of the circuit court of Kemper county, the appellant, Dr. W. H. Lipscomb, was tried, convicted, and sentenced to be hanged for the murder of Charles P. Stewart, from which judgment and sentence he prosecutes this appeal. Stewart died on the night of January 21, 1897. Just before going to bed for the night, he bathed his feet and took a capsule of medicine and laid down upon his bed. In a few minutes thereafter he became ill, and in twenty or thirty minutes died in convulsions, manifesting the symptoms usual in cases of strychnine poisoning. His wife, who was in the room, a Mr. Duran, and also a negro man, who came in, made endeavors at ministration for his relief. Duran went out to send to Scooba, a village about three miles away, for a physician. Stewart called upon the old negro to pray for him. In the interval between the third and last convulsions, and just before he died, he said to his wife: "I am going to die. I have been dead. The good Lord has sent me back to tell you that Dr. Lipscomb has killed me, has poisoned me with a capsule he gave me to-night; that Guy Jack had insured his life, and had hired Dr. Lipscomb to kill

him." Only Mrs. Stewart and the negro were present. The statement was voluntarily made by the deceased, and without suggestion of any kind. He was a young man, who appeared to be strong and vigorous. On the day of his death he went to the village of Scooba on some business, and returned to his home about dark, fed his horse, and ate heartily at supper, apparently in good health and cheerful spirits. But it seems that he was being treated by Dr. Lipscomb for some disorder, and while in Scooba on that day Dr. Lipscomb prescribed for him. The prescription called for three capsules, to be compounded of quinine, antikamia, and strychnine, each capsule to contain one sixtieth of a grain of strychnine. After the prescription was written by Dr. Lipscomb at his office, which was at the drug store of Dr. Mohler, who was a professional partner of Lipscomb, it was taken in person by Lipscomb to the drug store of Dr. Morney, about a square away, for the alleged reason that Dr. Mohler had no antikamia, Lipscomb telling Stewart he would get it for him. When the capsules had been prepared, manufactured tablets of strychnine of one-fiftieth of a grain each being used, they were placed in a box marked with directions, "Take one at night," handed by the druggist to Dr. Lipscomb, who took the box and went out upon the street, found Stewart, and gave him the box, and instructed him to bathe his feet and to take one at bedtime. Stewart's father was present when the box was handed to his son by Lipscomb, and, in a little while after parting from Dr. Lipscomb, Stewart, who had kept the box in his hand, opened it, and making some comment as to the size of the capsule, showed it to his father, who testified that there was but one capsule in the box. An analysis of the stomach of Stewart revealed the presence of one and one-half grains of pure strychnine, which had not been absorbed.

The foregoing is a brief statement of such of the facts as are deemed necessary to our understanding of the questions of law presented by this appeal. On the trial of the case, the wife of the deceased testified to the declaration above mentioned, made

by her husband before his death. This testimony was admitted as the dying declaration of the deceased, over the objection of the defendant, which ruling is assigned for error.

An autopsy was held by several physicians, including the appellant. The result of the autopsy was reduced to writing. It described the appearance and condition of the body and the various organs. It was written out by one of the physicians, and read over, section by section, in the presence of all, and, as he testified, it was his understanding and recollection that all, including Dr. Lipscomb, assented to it, and he thereupon signed his own and the names of the other physicians. This paper was admitted in evidence, and read to the jury, over defendant's objection. When the jury retired to consider their verdict, the defendant requested that the paper be delivered to the jury, which the court refused. Exceptions were also taken to the action of the court in granting or refusing certain instructions. These rulings of the court, among others, are now, on this appeal, assigned for error. We will first consider the instructions.

The second instruction given for the state is an effort to define a "reasonable doubt." It is as follows: "The court charges the jury that by a reasonable doubt is meant, not a mere speculative doubt or vague conjecture, mere supposition or hypothesis, but such a doubt as reasonably arises out of the testimony in this case—a doubt for which a reason can be given, in view of the testimony or want of satisfactory testimony." This instruction is not erroneous, for it does not embody an incorrect definition. It is no definition at all. It is mere tautology, stated with awkward circumlocution. The terms of the expression, "reasonable doubt," import the most exact idea of its meaning, and are incapable of simplification, and there is no equivalent in phrase more easily understood. All such endeavor is futile and foredoomed, the usual result being a maze of casuistry, tending to confuse rather than to enlighten, often evolving incorrect propositions, as shown in the recent cases of *Powers* v. *State*, 74 Miss., 779; *Hammon* v. *State*, 74 Miss.,

214; *Williams* v. *State*, 73 Miss., 822; *Burt* v. *State*, 72 Miss., 408; and *Brown* v. *State*, 72 Miss., 95.    In all of these cases, besides the specific errors of the particular instruction considered, the practice of attempting such definition at all is criticized and deprecated, if not condemned.

The seventh instruction for the state contains a hypothetical statement of facts, of which the jury are told, "if they believe," constitute guilt, omitting the word, "beyond a reasonable doubt," and is consequently erroneous; but the error seems to be avoided by the subsequent instruction, which is nearly identical, and by others.

The ninth instruction for the state is in these words: "Circumstantial evidence has been received in every age of common law as competent evidence, and it may rise so high in the scale of belief as to generate full conviction.    When, after due caution, this result is reached, the law authorizes the jury to act on it."    "Full conviction" is not the criterion of the degree of proof necessary to a conviction.    It is a loose phrase.    It has no distinct legal import, and is without accuracy to the common understanding.    It is vague, indefinite, and inexact. It may be the equivalent of sincere or conscientious belief.    It may mean that full conviction when the facts proven satisfy the judgment as to the truth of the charge.    There is but one rule and one law in this state as to the measure and sufficiency of proof which will warrant conviction.    It is that the evidence must engender a certainty of belief beyond a reasonable doubt. This rule has prevailed without abatement, not only in the ages of common law, but it embodies an everlasting human right, coeval with all society.    It is not enough that "the jury should be satisfied from the evidence, as fair, reasonable or conscientious men, of the guilt of the accused" (*Powers* v. *State*, *supra*), or "that they conscientiously believe him guilty."    *Burt* v. *State*, and *Brown* v. *State*, *supra*; *Hammond* v. *State*, 74 Miss., 214.

In *Williams* v. *State*, 73 Miss., 822, the jury were instructed that "if, after a careful consideration of all the evidence in the

case, you can say and feel that you have an abiding conviction of the guilt of the defendant, and are fully satisfied of the truth of the charge, then you are satisfied beyond a reasonable doubt, and your verdict should be guilty;'' as to which the court in that case says: '' The second instruction for the state is erroneous in attempting to define ' reasonable doubt.' . . . The concluding part of the charge expressly defines reasonable doubt by telling the jury that ' abiding conviction of the guilt of the defendant, or full satisfaction of his guilt, is the equivalent of belief beyond a reasonable doubt.' This is another of the many vain attempts to compute that which is not number, and measure that which is not space.'' It was held one of the errors for which that case was reversed. The hypotheses of that instruction, it will be observed, are, however, stated conjunctively. The statement is, '' If you have an ' abiding conviction ' of the guilt. . . . ' and ' are fully satisfied of the truth of the charge.'' '' Full conviction '' cannot certainly mean more than '' fully satisfied,'' but if, conjunctively, '' an abiding conviction of guilt '' and '' full satisfaction of the truth of the charge '' be erroneous, as not equivalent to a belief beyond a reasonable doubt, it must follow that '' full conviction ' is in less degree such equivalent. It is error.

The fifteenth instruction asked by the defendant, and refused, is as follows: '' The court instructs the jury that the dying declarations of the deceased, made to his wife, are not entitled to the same credit and force as if the deceased was still alive and testifying in the presence of the jury, under oath; that it is a species of hearsay evidence, and is intrinsically weaker than if the declarant was present and subject to cross-examination; and the jury alone is the judge of its weight and force.'' We all concur that if it be the true purport of the instruction that it is intended to point out, by way of precaution, the inherent qualities, which, by law, pertain to all dying declarations, and be held to refer to the source, rather than the matter, of the testimony, it would, in that view, not be upon the weight of evi-

dence, within the meaning of the statute.    In cases of perjury, seduction, and the like, requiring corroborative evidence as to certain testimony, and in cases involving the testimony of accomplices and evidence of admissions made by a party against his interest, and the like, it is entirely proper to point out to the jury the circumstances affecting the source or character of the evidence, which, according to settled rules, operate to its disparagement, being careful to leave to the jury the untrammeled right to consider the testimony, and give it what weight they may deem it worthy.    Abstractly, it is true, as a matter of law, that a dying declaration is a species of hearsay testimony, and, of itself, is not entitled to the same force as if the witness was living and testifying, and subject to a cross-examination.    *Lambeth* v. *State*, 23 Miss., 322.    The question presented by this instruction involves a consideration of the law applicable to the admission of dying declarations, and the reasons upon which they are founded, and which determine the character of such testimony from a legal standpoint.    Dying declarations constitute the only exception to the constitutional right of the accused to be confronted with the witnesses against him, and be afforded the right to cross-examine them.    In all trials and on all issues the cross-examination is the most effective means of eliciting and ascertaining the truth.    While the solemnity under which they are usually made is deemed, in some sense, an equivalent for the sanctity of an oath, yet their admissibility rests upon the grounds of necessity and public policy, and upon the presumption that, in the absence of other proof, crimes might go unpunished.    The rules which govern the admission of such testimony are familiar and rudimental: (1) They must be made under the realization and solemn sense of impending death, when the motive for falsehood may be presumed to be lost in the despair of life; (2) they must be the utterance of a sane mind; (3) they are restricted to the act of killing, and the circumstances immediately attending it and forming a part of the *res gestæ;* (4) no declaration, or any part

of it, is admissible, unless competent and relevant, if made by a living witness; (5) that great caution should be observed in the admission of such testimony, and the rules which restrict it be carefully guarded.

The authorities abound with discussion of the reasons and considerations upon which these rules are founded, looking to the conservation of truth and that justice might prevail. The circumstance that the declaration is hearsay, and is without the essential element of cross-examination, stands, *facile princeps*, the most important of these reasons, and incidentally and necessarily involves other considerations. 1 Greenl. Ev., sec. 162; 1 Phil. Ev., 300; *People* v. *Sanchez*, 24 Cal., 17. "The admission of dying declarations as evidence, being in derogation of the general rule which subjects the testimony of witnesses to the two important tests of truth, an oath and a cross-examination, it is obvious that such evidence should be admitted only upon the grounds of necessity and public policy, and should be restricted to the act of killing and *res gestæ*." *Leiber* v. *Com.*, 9 Bush, 11; 2 Starkie, Ev., p. 366; *Bell* v. *State*, 72 Miss., 513.

There are other considerations which have been dwelt upon by law writers and judges. Statements made under the shadow of approaching death may come with the infirmity of inattention, when the mind is diverted to the thoughts of the future; the vigor of the mind may be impaired; facts may be but partially stated; inferences and opinions may be stated as facts; the passions of anger and revenge may linger, after all hope of life is fled, and affect the truth of the statement. It must come as the memory of those who heard it, subject to all the uncertainties of a correct understanding of the speech as made, and of a correct reproduction by the memory of what was truly said. Mr. Roscoe says: "Such considerations show the necessity of caution in receiving impressions from accounts given by persons in a dying state, especially when it is considered that they cannot be subjected to the power of cross-examination, a power quite as

necessary for securing the truth as the religious obligation of an oath can be.'' Rosc. Cr. Ev., p. 35. The foregoing principles are repeated, *iterum iterumque*, in varying phrase, in numerous authorities and cases, and are the well-settled law of this state. *Bell* v. *State*, *supra; Lambeth* v. *State*, 23 Miss., 350; *Nelms* v. *State*, 13 Smed. & M., 501; *Brown* v. *State*, 32 Miss., 433; *Merrill* v. *State*, 58 Miss., 66; *Montgomery* v. *State*, 80 Ind., 338; *Moore* v. *State*, 12 Ala., 764; *Binns* v. *State*, 46 Ind., 311. In *State* v. *Vansant*, 80 Mo., 78, it is said: ''Besides, such declarations are afflicted with the common infirmity which attaches to all oral statements or verbal admissions reduced to writing or repeated by another, and are liable to be colored or deflected by the medium through which they are transmitted to the jury.'' And in Lambeth's case, *supra*, Mr. Justice Yerger said that a dying declaration was not entitled to the same weight and force as if delivered by a living witness.

In *Brown* v. *State*, 32 Miss., 442, it is said, after commenting upon the nature of dying declarations, that ''it is, therefore, the dictates of reason and common sense that declarations of this character, in all cases, and under any circumstances, should be admitted with caution and weighed by the jury with the greatest deliberation.'' 1 Greenl. on Ev., sec. 162. We all concur that it is clear that as to dying declarations it would not be objectionable if the jury be charged that while they are the sole judges of the weight and effect to be given to a dying declaration, and that it is to be determined like any other evidence, in the light of all the evidence of the case, and to caution them, in determining its effect, that they should weigh it with great deliberation and care, and take into consideration the circumstances of its being hearsay; that it is the statement of one not subject to cross-examination, or such other relevant circumstances in that regard as may exist in any given case; and that it is the duty of the court to lay before the jury, by precautionary instructions, when asked, the inherent elements of weakness which the law recognizes in certain classes of evidence, but in

such form as not to invade the province of the jury.    The major-
ity of the court hold that this instruction is not upon the weight of
evidence; that its true purport is cautionary, and refers rather
to the source than to the effect of the testimony.    For myself,
I do not concur in this view.    It embodies argumentative state-
ments of the law abstractly correct, but so stated as to bear
upon the weight of evidence, and, in my opinion, was properly
refused.    In *Lewis* v. *Christie*, 99 Ind., 377, an instruction
which followed the text of the most authoritative writer in the
language on evidence (Greenleaf) was condemned, and it was
said that argumentative statements of the law, though correct,
may not always be an accurate rule of guidance to a jury.
1 Thomp. on Trials, sec. 640.    We find no error in the rulings
of the court as to the other instructions.

We come next to consider the ruling of the court upon the
admission of the dying declaration, in respect to which several
propositions are contended for by the appellant, which may be
formulated as follows: (1) The proof did not show that at the
time of making the declaration Stewart realized that his days
were numbered, and the solemn hour of his death was at hand;
(2) that the statement itself, in its peculiar character, bore evi-
dence of mental incapacity, of unbalanced reason, and that it
was a mere hallucination of a disordered mind; (3) that the
declaration was not the statement of a fact, as of his knowledge,
but an opinion, a mere belief, a conclusion deduced and inferred
from other collateral facts.

All of the above propositions involve questions of fact, to be
ascertained and passed upon by the trial judge upon a prelimi-
nary investigation, and in that sense are commonly designated
questions of law.    1 Rosc. Cr. Ev. (8th ed.), 61; 1 Greenl.
Ev., 219; Whart. Cr. Ev., 689; 1 Phil. Ev., 3, 7, 573; *Sim-
mons* v. *State*, 61 Miss., 243; *State* v. *Burns*, 33 Mo., 483;
*Kilgore* v. *State*, 74 Ala., 1; *Owens* v. *State*, 59 Miss., 547;
*Ellis* v. *State*, 65 Miss., 48; *Bell* v. *State*, 72 Miss., 510.

It is therefore pertinent to inquire what degree of proof in

law is required as to the facts which constitute what is ordinarily termed the foundation for the admission of such testimony—whether they should be established to the satisfaction of the court, or to that higher degree of certainty which excludes all reasonable doubt—and to what degree of certainty must it appear to be competent as the statement of a fact; and, second, what rules should prevail in determining whether it is an opinion or a statement of a fact—whether the literal form of a statement is to control, or whether its true character is to be gathered from the statement, considered in connection with the surrounding circumstances.

Taking up the first proposition, we find that the authorities in this state establish the rule that in a preliminary investigation by the court, for the ascertainment of facts precedent and necessary to the competency of proposed evidence, the degree of proof should be such as to exclude all reasonable doubt as to the facts of such foundation; and this is certainly true when the competency of any testimony rests upon collateral facts, independent of the main fact proposed to be proved; and in this case the rule applies to the preliminary questions (1) whether Stewart realized he was *in extremis;* (2) whether he was at the time sane and rational. *Bell* v. *State*, 72 Miss., 510; *Owens* v. *State*, 59 Miss., 549; *Simmons* v. *State*, 61 Miss., 257; *Holly* v. *State*, 55 Miss., 430; *Ellis* v. *State*, 65 Miss., 48.

But the competency of a statement, whether one of fact or opinion, is a question of judicial interpretation as to its meaning, as indicated by its terms, viewed in the light of surrounding circumstances. The interpretation must rest upon the ascertainment as to what was the true purport of the declaration. It is the conclusion to be reached as to this fact which must control. If it be a reasonable construction that a statement is one of fact, it ought to be admitted.

Tested by the foregoing principles, we are of opinion that the judgment of the court below was right in holding that the foundation was sufficiently laid (1) as to the fact that Stewart

was *in extremis* when the statement was made, and that he realized that he was beyond the hope of recovery, and (2) that at the time he was not insane or delirious, but spoke with discernment, reason and intelligence. We think the evidence established both of these propositions beyond reasonable doubt. He was in the throes of death when the statement was made, and died shortly thereafter. He called upon a bystander to pray for him, and declared that he was going to die. As to his mental condition, there is nothing in the evidence to justify a doubt that he was rational, except the suddenness, violence and brevity of the attack—a condition not inconsistent with a sound mind. It is argued that the statement itself, in form and substance, *res ipsa loquitur*, is the utterance of a mind diseased—an illusion of a disordered imagination. We do not so view it. The words of the speech may be unusual, yet they are words of discernment and reason.

This brings us to the question as to the admissibility of the declaration itself as evidence. If, according to the rule announced, it is a reasonable and probable theory that the declaration, according to its just import, taken in connection with the surrounding and relevant circumstances, was a statement of a fact within the knowledge and observation of Stewart, then it is competent, and its credibility and value as evidence was properly submitted to the jury; but if such an interpretation be unreasonable, or involves an improbable theory as to any assumed fact, it was incompetent, and the ruling of the court erroneous. At the threshold of the question we are met with the contention that so much of the statement as refers to Guy Jack having insurance upon Stewart's life, and that he hired Lipscomb to kill him, are facts which are not of the *res gestæ*, as immediately connected with the killing, and that part—" that he had been dead, and the Lord had sent him back to tell "—is irrelevant, and consequently that the court erred in admitting the whole declaration which embraced these statements. That they were not a part of the *res gestæ*, and are irrelevant, goes

without saying, and, as such, were inadmissible.   But, inas-
much as no specific objection was made to these particular parts
of the declaration, but was to the whole statement, it is con-
tended, on the other hand, that such objection, according to
familiar rules, will not avail if any part of the declaration was
competent or relevant.   Inasmuch as the decisions in this state
are not apparently uniform as to the practice in applying the
rule, it is deemed proper that a statement of the law as to this
very familiar rule, as we all understand it, be made.

It is well settled, by numerous adjudications, that a general
objection raises no issue, except it is as to whether the evidence
would, under any circumstances or for any purpose, be admit-
ted, and that a specific objection raises no other issue than the
particular one tendered.   If, under any circumstances of the
case, testimony be admissible, a general objection would be
properly overruled; and, conversely, it would be error to sus-
tain a general objection if, under any view of the case, the evi-
dence might be admissible.   This rule applies with particular
force in cases where the objection may have a twofold aspect,
and may be put upon different grounds.   It might go to the
competency of the witness, to the mode of proof, to the insuffi-
ciency of the foundation, or to the relevancy or competency of
the matter of the testimony.   Testimony may be material and
relevant, and still incompetent by reason of the method of
proof or lack of some precedent predicate required by law to
be first established, and *vice versa*.   In *Heard* v. *State*, 59
Miss., 546, it is said: " When an objection is made to evidence
which in its nature is such as may be obviated, it must be spe-
cific, so as to allow the party offering it an opportunity to supply
its place if the objection is sustained, and, where this is not
done, it will not be noticed in the appellate court." *Morris* v.
*Henderson*, 37 Miss., 492; *Brown* v. *State*, 72 Miss., 95.   The
reason of the rule is said to be twofold: (1) To enable the trial
judge to understand the precise question upon which he has to
rule, that he should not be required to search for objections

which counsel do not discover, or conceal; (2) to afford the opposite party an opportunity to obviate it if well taken. *Decell* v. *Lewenthal*, 57 Miss., 331; *Heard* v. *State*, 59 Miss., 545; 1 Thomp. Trials, sec. 693; *Wesling* v. *Noonan*, 31 Miss., 599; *Morris* v. *Henderson*, 37 Miss., 492; *Brown* v. *State*, 72 Miss., 95; *Mills Co.* v. *Smith*, 69 Miss., 299; *Reynolds* v. *State*, 68 Ala., 502; *Archibald* v. *State*, 122 Ind., 122 (23 N. E., 758); *Dozier* v. *Jerman*, 30 Mo., 216; *Brown* v. *Weightman* (Mich.), 29 N. W., 98; *Moore* v. *Bank*, 13 Pet., 302; *Stone* v. *Oil Co.*, 41 Ill., 85; *Gilbert* v. *Thompson*, 14 Minn., 544 (Gil., 414); *Rush* v. *French*, 1 Ariz., 99 (25 Pac., 816).

A large number of cases to the same effect are collected in 1 Thomp. Trials, sec. 693. The rule also involves the particular proposition that a general objection is properly overruled to testimony a part of which is admissible and part not. But this particular rule has not been uniformly followed in this state. In *Merrill* v. *State*, 58 Miss., 66, and in *Field* v. *State*, 57 Miss., 474, statements were admitted in evidence parts of which were admissible and part were not. In both cases the ruling of the court was held to be erroneous, notwithstanding the objection was general. It is true the point was not made in either case invoking the rule that the objection was general. It has been well observed that a court might take cognizance of fatal error in proper cases to avoid injustice, notwithstanding, by inadvertence or accident, the objections were not made specific or properly framed. In view of the fact that the rule has not been strictly enforced in this state in all cases, by reason whereof some doubt may have prevailed as to the practice, it might be questioned whether it ought to be enforced in this case, especially as the record shows that the objection was argued by both sides, and presumably, of course, upon specific grounds. We do decide that Field's case and Merrill's case are not to be held as precedents for a different rule than that announced above.

Again, as preliminary to the question of the admissibility of

the statement, it is important to first ascertain, as a rule of interpretation, whether the form of the statement—the literal sense of the words used—is to govern, for, if this controls the interpretation, there is no room for construction, for leaving out the figurative reference to the Lord, as is proper to do, the words of the statement, in their ordinary significance, literally interpreted, fairly import knowledge, and not opinion. We appreciate the force of the argument so ably made by counsel, for the state, which is supported by some precedents, that the face of the statement alone must be looked to for its purport in that respect. The proposition is not founded in sound reason, and is contrary to the great weight of authority. The ends of justice are to be attained only by ascertaining, as far as practicable, the very truth. The truth as to the purport of any speech—its true meaning—is to be gathered, not from the literal form of the phrase and irrespective of the nature of the 'act narrated. The situation of the speaker; what of mental impulse, motive, inducement or emotion was evinced, and all the surrounding circumstances; the words used, their literal signification, as well as that in which, in common parlance, they are often employed; and the character and nature of the fact stated, are all to be considered in determining the truth as to the meaning of any utterance. They are " the light unto the path " which leads to a true solution of every such problem.

It is of common experience that matters of information, and of belief or opinion, are generally expressed in a form importing personal knowledge. Fixed convictions, regardless of the mental processes involved, take the form of dogmatic assertion, and suspicion is couched in terms of direct accusation. Even the cautious and learned do not discriminate, and give emphasis to their settled conclusions by declaring, " I know." In this case, an expert physician, who had heard all the evidence pertaining to the symptoms of Stewart's malady, and the evidence of the presence of strychnine disclosed by analysis, when asked if he could state from these facts the cause of death, replied

" that the evidence makes me believe—I know; I believe I can say I know—that he died from strychnine poisoning." "I know that my Redeemer liveth" is the exclamation of an exalted faith, disclaiming all equivocation, and yet the thought traverses the realms of the unknown and the unknowable. *Credo ut intelligam.* The question is not one of the probability of the truth of the fact stated, or of the opportunities for knowledge, but what is the statement itself with reference to the fact? Is it an opinion or not? And the true rule, we have already announced, is that it should be given that construction in this regard which, under the circumstances, appears most reasonable. *State* v. *Williams,* 67 N. C., 12; *Walker* v. *State,* 39 Ark., 221; *Jones* v. *State,* 52 Ark., 345 (12 S. W., 704); *Bell* v. *State,* 72 Miss., 514; *Nelms* v. *State,* 13 Smed. & M., 500.

Cases could be multiplied all to like effect, that a statement is not to be held as one of fact because of the literal sense of its words, but is to be interpreted in the light of all the attendant circumstances. Applying these rules of interpretation to the dying declaration in this case, the majority of the court hold that a part of the declaration, to wit: that "Dr. Lipscomb has killed me, has poisoned me with a capsule he gave me to-night," is separable from the other parts of the statement, and is competent as a statement of fact. The other parts—the reference to "the Lord sending him back to tell," etc., "that Guy Jack had his life insured, and hired Lipscomb to kill him"—are, of course, inadmissible. Judges Whitfield and Thompson hold that no error can be predicated on the admission of the incompetent matter under a general objection. I dissent from the view that any part of the declaration was admissible. It seems to me that when the declaration, "Dr. Lipscomb has killed me; he has poisoned me with a capsule he gave me to-night," is considered, not according to its literal terms, but in the light of all the circumstances and in connection with all parts of the statement and the nature of the act alleged and the mental processes necessa-

rily involved, the conclusion is inevitable that the statement was not one of knowledge, but the expression of an opinion, a mere inference, a deduction, a conclusion. The very nature of the thing stated implies a process of reasoning by induction. Facts which the law recognizes as of knowledge must, be perceived through the senses. Cause and efficient agencies may be perceived and known as well as effect, but an agency or cause which is known only by subsequent effect, is not known in truth, but deduced, and the particular agency can only be inferred. Stewart knew he took a capsule. He did not know it was poison. He afterwards knew and felt certain sensations. They were subsequent effects. That they were the effects of poison he could not know, but only infer. He could not know any more, nor as much, as an expert physician, had one been present observing his condition, and what, in such case, would be observed by the physician and felt by Stewart, would be but symptoms to both, indications evidentiary in character, but which, from the nature of things, could only be the basis as facts from which other facts could be concluded. The facts known to Stewart pointed with unerring certainty to the truth—that he was poisoned; yet, the truth still remains only an inference of fact. If he knew the capsule was poison, he knew it when he took it— an incredible theory. If he became convinced of it afterward, as well he may have done, then it was a deduction, logical and conclusive it may have been, but still a deduction, inferred from his symptoms, the taking of the capsule and the insurance upon his life. His assertion that Jack held insurance upon his life, and hired Lipscomb to kill him, though illegal evidence, throws a flood of light upon his meaning. It lays bear the processes of his mind. The capsule, the insurance and his dying condition, revealed to him to a moral certainty the motive and agencies of the foul murder, but the revelation came only through a process of reasoning by inference, and, at last, only as an opinion.

It is urged in argument that it is a "fact" that Stewart

was poisoned, and as the evidence tends to show it was administered by Lipscomb, that it is also a "fact" that Lipscomb poisoned him, and that the declaration, therefore, states them as "facts."

The argument is in a circle. Of course a "fact" may be stated, but not in the sense that the statement makes the "fact," for the fact exists independent of the statement, but in the sense that it asserts knowledge that a thing was done or an act come to pass. The question is not whether the matters of the statement are matters of fact, of things or acts done, but whether the statement made in reference thereto is an opinion concerning the facts or an assertion of personal knowledge of the facts. A "statement of a fact," as distinguished from hearsay or opinion evidence, means the testimony by a witness of his recollection of things observed and perceived by him. It is that knowledge which is derived through impressions made upon the senses by external objects and through subjective sensations. Without reference to the metaphysical theories of the processes of sensation, experience, acquired perception, intuitions, reflection, ideation, and the like, it is enough for the practical purposes of the law that the knowledge of which a witness may testify is the ordinary perception and understanding of things seen or heard, or otherwise perceived through the senses, or subjectively experienced through sensation, and whatever other facts these import are inferences.

The argument based upon the illustration that when one is seen to fire a pistol toward another, and that other feels the shock and pain of the wound, and in such case knows that he is shot, though not seeing the flight of the missile, is without analogy, and its fallacy is apparent. For in that case the very agency or cause of the hurt is seen. The act of the shooting and design is seen before and simultaneously with the effect, and the instrument used, according to universal experience and common knowledge, is a deadly weapon, and when fired produces a wound instantaneously and simultaneously with the shot,

and a wound of a character as unique and universally known as are the outlines of a horse, by which we distinguish him from other animals.

Whenever poison is taken, and it be not known at the time, it cannot be known in a legal sense at all. It may be demonstrated as a certainty, and even that cannot be done absolutely, if the symptoms felt by the victim or seen by others be relied on. This is self-evident. It may be demonstrated beyond a reasonable doubt, but then only by inductive reasoning. If, besides the symptoms, an analysis is made, then the demonstration may become absolutely certain, but no one will say that the disclosure afforded by an analysis imparts knowledge of the cause of the death, as distinguished from conclusion.

It is argued that the nearness in point of time between the taking and the effect of poison, enables one to know that he is poisoned. The fact is, he knows nothing but the effect, and the cause, whether near or distant, stands in mental contemplation apart from it, and cannot be perceived by the senses, but must be reached by the reason. And this argument would concede that, if longer time intervened, it might not be "knowledge," which demonstrates that it is only opinion in both cases, the difference being in the degree of certainty. Cause and effect are concepts of the relation of things. Both may be perceived and known, but where only one is known, the other can only be inferred. It is true that one may speak of his sensations and describe them as of his knowledge, and it would be competent if the statement meant only that he felt as if he was poisoned, for that would be but a description, however uncertain, vague and conjectural it might be. In my opinion no part of the statement is admissible. It is true the fact is stated by implication that he took a capsule which Lipscomb gave him, and if that stood by itself, it would be admissible. But it is not stated directly. It is stated by implication, *sub modo*, in the general charge that Lipscomb poisoned him with a capsule he gave him. The principal proposition of the statement is

that Lipscomb poisoned him, and this is inadmissible. It is a charge which sentiment and imagination invest with potential effect. In its chief significance and the quality of its most effective import it is mere conjecture, and legally false. It cannot be made to do duty as evidence of the incidental fact implied that Lipscomb gave him the capsule.

Nor can I concur with the majority of the court that the statement can be separated in its parts, and to hold a part admissible and a part not. Even conceding, as held by the majority of the court, that so much of the statement, to wit: "That he poisoned me with a capsule he gave me," is admissible, taken by itself, yet, it seems to me that the declaration is so related in its parts that the true meaning of any part cannot be had, except when considered in its connection. It should stand or fall as a connected whole.

The statement cannot be even constructed grammatically into different sentences. It embodies a continuity of thought and expression relating to a single fact, the cause of his death. The parts proposed to be rejected stand in the relation of emphatic qualification of the meaning of that proposed to be admitted, even to the extent of casting upon the whole suspicion and doubt. Is not the defendant entitled to the benefit of the absurdity involved in the introduction: "I have been dead, but the good Lord has sent me back to tell," etc.? It goes to the discredit of the whole statement. So the concluding part: "Guy Jack had my life insured, and hired Lipscomb to kill me," is a component part of the statement. It is manifestly the expressed reason and ground for the statement that Lipscomb had poisoned him. It is rejected as inadmissible because it is a palpable conjecture, but that very construction supports the theory that the whole statement is mere opinion, and in that respect tends to qualify it. To vary the weight and significance of the statement by arbitrary and artificial adjustment is to juggle with its sense. It is a grave injustice, to be remedied only by admitting the whole statement—a greater injustice.

An examination of all the cases cited by counsel, in support of their view of the dying declaration, and of many others, has been made, but none of them seem to me to support the proposition contended for. It is true that in Payne's case, 61 Miss., which is followed in Powell's case 74 Miss., the statement "shot me without cause," and the case of Boyle, 105 Ind., where the statement was "he cut me without reason," go to a further limit in holding such statements to be of fact than any other adjudications where the precise question is decided. For the decision in Payne's case no reason is given. It was simply asserted that the statement was a fact and not an opinion—a *petitio principii*. But one authority is cited, and that is the case of *Wroe* v. *State*, 20 Ohio, which will be found upon examination to be doubtful authority for the principle announced. In the case of *Boyle* v. *State*, 105 Ind., 469, which follows Payne's case, the dissenting opinion by one of the judges is an overwhelming demonstration of its error. Payne's case rests upon Wroe's case, and that upon *Handy* v. *Commonwealth*, 5 Crim. L. Mag. (Ky.), 47, and that, in turn, upon *Rex* v. *Scaife*, 1 M. & R., 551. Referring to these cases, we find that, in the case of *Rex* v. *Scaife*, "I don't think he would have struck me if I had not provoked him," was admitted, after hesitation, by Coleridge, J., but upon the express ground that it was in favor of and not against the prisoner. And in *Handy* v. *Commonwealth* (Ky.), referring to Coleridge's decision, *supra*, it is said: "That the general rule that declarations of deceased are admissible only when they relate to facts, and not to opinions, is subject to the exception that declarations of mere opinion of deceased are admissible when favorable to the accused, and explained the conduct of the deceased," and yet this case is cited in Wroe's case, as authority for the proposition that the statement was one of fact. But that case of *Handy* v. *Commonwealth* is without any analogy to the cases of Wroe, Boyle, or Payne. The authority of that tribunal, however, in an exactly analogous case, condemns the cases mentioned. In *Col-*

*lins* v. *Commonwealth*, 12 Bush (Ky.), 271, the declaration was, "Michael Collins killed me, and killed me for nothing;" as to which Chief Justice Lindsay says: "The statement that Collins killed the deceased for nothing was but the expression of an opinion, and was clearly inadmissible."

In the cases of *People* v. *Farmer*, 77 Cal., 41; *Richards* v. *State*, 87 Wis.; *Robert* v. *State*, 5 Tex. App., 141; *People* v. *Green*, 1 Denio; *Weight* v. *State*, 30 Tex. Co. App.; *State* v. *Terrell*, 12 Richards, 330; *State* v. *Belton*, 24 S. C., 188, the question as to whether the declaration was one of "fact" or "opinion" was not raised. In the case of *Walker* v. *State*, 39 Ark., 22, the statement was, "Nick Walker shot me," and though the evidence shows it was through an auger hole at night, it was admitted upon the theory that it was in the form of a statement of fact, and if, by any possibility, it could be known to the declarant, it was admissible; but this case was overruled practically in *Jones* v. *State*, 52 Ark., where a person was shot through a crack, and it was held impossible that he could know. In *Brotherton* v. *People*, 75 N. Y., 159, the deceased stated he did not recognize the prisoner until he commenced his pranks. The prisoner was disguised as a tramp, was the son-in-law of and well known to the deceased, and the testimony was clearly admissible as indicating knowledge from his personal observation. In the case of *State* v. *Arnold*, 13 Iredell, the declaration was that "A. B. has shot me, and none other." It is contended that, from the situation of the parties at the time, deceased did not have an opportunity of knowing the fact so as to enable him to express more than an opinion on the point, which was held to go to the credibility of the statement. In *State* v. *Giles*, 8 Wash., 12, the declaration was, "They butchered me." The indictment was for manslaughter for an unnecessary surgical operation. The court held that it no more expressed an opinion than the word "killed" used without qualification. *Hackett* v. *People*, 54 Barbour, 370, merely distinguishes between what is and what is not *res gestæ*. In *Com-*

*monwealth* v. *Matthews*, 87 Ky., 287, the statement was that the accused and the deceased were engaged in playing, and that the shooting was an accident, and held admissible for the defendant. In *State* v. *Clemons*, 51 Iowa, 274, the declaration was, "Ed Clemons shot me; ain't I right?" The court says: "The closing part is put in the way of an interrogatory, and may have been for the purpose of assuring himself, not that he was correct as a matter of opinion, but that his observation of the fact was correct." In *Sullivan* v. *State*, 102 Ala., 142, "Jim Sullivan cut me; he cut me for nothing. I never did anything to him." And to the objection made that the statement was one of opinion, the decision in the case made but a single reference to it, contained in two lines. It says, "True, this statement was very general, but it is admissible as a collective fact," citing Brickell's Digest, 437. Certainly in this case the expression, "he cut me for nothing; I never did anything to him," might well be held not an opinion, but a denial that the deceased made any overt act, in view of the circumstances shown for the state that, at the time he was stabbed, he was standing with both hands to his sides in a natural position, and made no movement whatever. But how the expression "collective fact," whatever that may mean, tends to illustrate the difference between a fact and an opinion, is incomprehensible to me. In *Jordan* v. *State*, 81 Ala., 20, the statement was, "Jule shot me, and Handy cut me, and all for nothing," and the only objection urged to it in the appellate court was that no sufficient predicate had been laid, and this was the only question relating to the dying declaration decided by the court.

It will thus be seen that but few of the cases cited for the state are distinctly upon the question whether the dying declaration was a statement of fact or an opinion, or throw any light upon the precise question in this case. In but two of the cases where the question was a debatable one is any reason given for the conclusion that the statement was one of fact. In one (*Sullivan* v. *State*, 102 Ala., 142) it is put on the ground that

the statement was of a "collective fact," and the other is *Boyle* v. *State*, 105 Ind. Says the court in that case: "'He cut me without reason' is an inference of facts from observed facts," an exact definition of an opinion, and is its own refutation. Like the struck eagle, it may

> View its own feather on the fatal dart
> That winged the shaft that quivered in its heart.

Several of the cases above referred to have been challenged and condemned.

Rice on Evidence, vol. 3, p. 536, refers to *Wroe's case*, 20 Ohio St., 460, to *Roberts' case*, 5 Texas App., 141; *Payne* v. *State*, 61 Miss., 161; *People* v. *Abbott*, 4 Whart. Rep., 422; *Brotherton* v. *People*, 75 N. Y., 159, as being opposed to the weight of authority, as precedents for the admission of opinion evidence, and referring to the dissenting opinion in *Boyle* v. *State*, 105 Ind., 469, says: "It is seldom, indeed, that any opinion is so critical in its analysis, so exhaustive in its citation, or so logical in its conclusions. Any discussion of this subject which omits a careful consideration of this case must be regarded as grossly imperfect. The principal opinion was delivered by Mr. Justice Elliott. It is a very ingenious argument in favor of the prevailing view. But while perfectly aware that my function as a text writer will not tolerate the least attempt to make a law, I submit the dissenting opinion of this exceedingly able court contains the statement of the better view both on principle and authority."

Turning now to the other decision, I think it will appear that the declaration in this case, as admissible evidence, is absolutely condemned by precedent. Of all the adjudications examined, but one has been found directly in point, where the facts are almost identical. In the case of *Berry* v. *State*, 63 Ark., the circumstances were that the prisoner had given to the deceased a drink of whisky; that shortly after he was taken ill, and died from the effects of poison. To the physician who was called to at-

tend him, he stated "that he had drunk the whisky; that the prisoner had given it to him; that he was poisoned; that the prisoner had given him his dose; that it tasted nasty when he drank it." It will be observed how much stronger is this case than the one at bar in favor of the theory that it was a statement of fact, for he not only experienced the sensations which he thought might be those of poison, but he stated that the whisky "tasted" nasty, a fact which he perceived through one of his senses and that he drank the whisky which the prisoner had given him, yet the court, in that case, held the testimony to be incompetent, because it was but the expression of an opinion, and, in my judgment, rightfully so held.

The same principle is illustrated in many analogous cases. In *Whitley* v. *State*, 38 Ga., the statement was, that "it was hard to be killed for telling the truth; that God knew he told the truth, and Ed knew it was the truth," and was excluded as an opinion. In *Willaims* v. *State*, 67 N. C., the statement was excluded as an opinion which was to the effect that Williams shot him, but "I did not see him," though it was contended that he might have heard the prisoner, and identified him in that way. A witness cannot be allowed to state that the shooting was intentional. *Montgomery* v. *State*, 80 Ind., 328. In *Mc-Pherson* v. *State*, 22 Ga., 478, the declaration was, "Did not believe that accused intended to hurt him." This was excluded as an opinion, although in favor of the accused. *People* v. *Washington*, 3 W. C. Rep.: "I think this man Washington was the man that shot me," was excluded as an opinion. In the case of *Shaw* v. *People*, 3 Hunt (N. Y.), 272, it is said that "it is more important to exclude an opinion *declaratio in articula mortis*." In *Chambers* v. *State*, 87 Mo., 408, declarant said he thought he was about to draw something from his pocket— a knife or pistol—and that he followed him so that if he did draw a knife or pistol he could catch or knock it out of his hand before he could hurt him, and this was excluded upon the ground that it was an opinion. *Moore* v. *State*, 33 Ala., 421, the de-

clarant, after detailing the circumstances of the homicide, said that defendant was the only slave on the plantation at enmity with him, was excluded. Of like effect is *Jones* v. *State*, 17 Ala.; *Binn* v. *State*, 37 Ala., 103; *Loshbaugh* v. *Birdsell*, 90 Ind., 466; *Yost* v. *Conroy*, 92 Ind., 464; *Ferguson* v. *Hubbell*, 97 N. Y., 507; *Warren* v. *State*, 9 Tex. Ct. App., 629; *Moex* v. *State*, 100 Ill., 240. In the light of these unchallenged precedents, on principle and justice, it is my conclusion that the dying declaration of Stewart was not a statement of fact, but an expression of an opinion, and inadmissible as evidence.

It is assigned for error that the court refused the request of the defendant to deliver to the jury the paper containing a memorandum of the autopsy. Seeing that it was plainly required by the statute, it is not perceived upon what possible ground the request was refused. But as all the facts in the memorandum were testified to orally, and the memorandum read, the error is not deemed material. If the dying declaration was irrelevant and incompetent evidence, there can be no doubt, in view of its character and probable effect, as to the consequences of such error. It is conceded that such error must be fatal to any verdict, and for which, as well as for the error in the ninth instruction given for the state, I am of opinion that the judgment of the court below must be reversed.

The conclusions of the court are, all concurring:

1. That the court below erred in granting the ninth instruction given for the state.

2. Judges Whitfield and Thompson concurring, Magruder dissenting, that the court erred in refusing fifteenth instruction asked by the defendant.

3. All concur that a part of the dying declaration is inadmissible. Judges Whitfield and Thomspon concur in holding a part admissible, to wit: "Dr. Lipscomb has killed me; he has poisoned me with a capsule he gave me to-night," and that this may be separated from the other parts of the statement. Judges Whitfield and Thompson hold that no error can be predicated of

the admission of the dying declaration on the ground a part of it is incompetent, for the reason that the objection to its admissibility is general, and not specific.   Magruder holds that no part of the dying declaration is admissible, and, from the character of the statement, is incapable of separation without injustice to the defendant.   Judges Thompson and Magruder concur that the case should be reversed, for the reasons indicated in their respective opinions, and Judge Whitfield, notwithstanding the errors conceded by him as to giving the ninth instruction for the state, and the refusal of the fifteenth instruction for the defendant, hold the case should be affirmed.

I fully concur in the view stated by Judge Thompson as to the law which should govern the reversal of cases for error.  It is not within the province of the appellate court, under our constitution and laws, to be the triers of fact and of guilt.   Our duty is to lay down, with unswerving purpose, the law as we find and understand it.   Questions of public policy belong to another forum.   A legal trial is a trial according to the law, and a legal conviction is a conviction by a jury according to recognized procedure and principles of law.   If, in any trial, an error of law be made, the case should be reversed, if it be so material or of such character as is calculated to influence, and probably did influence, the verdict.   The case is not to be looked at from a judicial standpoint, and the guilt of the accused be so ascertained, or the materiality and consequence of the error be so determined, the question in all cases being, not what the jury ought to do, or might do, according to our judgment, but whether the error is of such character as that the jury itself might have been influenced by it.

WHITFIELD, J., delivered the following opinion favoring an affirmance of the judgment appealed from.

Beyond what immediately follows I do not desire to be understood as saying anything touching the rules of law applicable to the laying of the predicate for the admission of a dying

declaration. There is certainly one thing of which the court should be satisfied beyond a reasonable doubt, which does enter into the general predicate necessary to be established before such declaration is competent, that the party had a sure and fixed belief that he was then about to die. It is true that no declaration by such declarant is competent as testimony unless it would be so competent were he living and testifying to the declaration; and that such declaration is only competent, as to its extent, so far as it relates to the act of killing and the *res gestæ* of such act. But these last two features seem to me not so much elements of the general predicate, as going to the competency of the different parts of the declaration. For example, the court would exclude all which the declarant would not be competent to testify to if living and testifying, and it will limit his declaration to the killing and the *res gestæ* of the killing; but these features do not go to the source of the testimony— the reason for its admission (which is, that the consciousness of impending death is a substitute for an oath, the public necessity relieving from the need of cross-examination)—but rather to the general competency of the different parts of the declaration, the court to determine such competency as it would determine the competency of any other testimony not in the dying declaration.

Whether my view as to these two features is correct or not, I am sure that the question of the competency of a part of a dying declaration, turning on its being an opinion or a statement of a fact, forms no part of the preliminary inquiry of the court as to the existence of the predicate making the declaration competent. The reasons which make the dying declaration competent are reasons which go alone to the source of the testimony, its character and nature, as the deliverance of a party soon to die, conscious that he must die, speaking under the solemnity of this consciousness—the substitute for the oath— and, from his situation, not able to be subjected to cross-examination. Whether part of the dying declaration is opinion or

the statement of a fact goes to its general competency as testi-
mony, without regard to its source, and is admitted or excluded
on precisely the same grounds as the statement of opinion or
fact would be in the case of any other witness. Manifestly,
therefore, when the court has decided as to the competency of
such statement that it is opinion or the statement of a fact, the
jury must accept it as being what the court declares it to be—
opinion or the statement of a fact; or, rather, the court has the
right, if it deems it opinion, to exclude it from the jury alto-
gether, but, if it deems it a statement of fact, the jury must
accept it as a statement of fact so far as its character is con-
cerned, but are, of course, themselves the exclusive judges of
what weight or credit they will give to the statement, treated as
a statement of fact.

The question whether it is opinion or the statement of a fact
is exclusively for the court in a dying declaration, just as it
would be, and precisely for the same reason it would be, if such
opinion or statement of a fact were testified to by any witness
on any other subject. And so, I think it is for the court to de-
termine what parts of such declaration relate to the killing and
its *res gestæ*, it being its duty to exclude all such parts as do
not relate to the killing and its *res gestæ*, just precisely for the
same reasons it would be the duty of the court to exclude the
testimony of any other witness which did not relate to the fact
in controversy and the *res gestæ* of that fact. And so, clearly,
that which the court deemed not relating to the fact of killing
and the *res gestæ* of the killing would never reach the jury, and
ought never to reach the jury. And, so, also, whether the
statement in a dying declaration would be competent if the
party lived and testified, is exclusively for the court as to its
competency, and, if not competent, the court would exclude it,
and it would never reach the jury, and ought not to. These
three things—whether the testimony is the statement of an
opinion or the statement of a fact, whether the declaration
would be competent if the party were living and testifying to

it, and what parts of the declaration relate to the killing and the *res gestæ* of the killing—seem to me to be things which the court should determine, so far as their competency is concerned, just as it would determine the competency of any like testimony by any other witness or any other issue involved in a case, and that it is not necessary that the court should be satisfied on its rulings as to these things beyond a reasonable doubt of their competency. But the court ought to be satisfied beyond a reasonable doubt that the party had a sure and fixed belief that he was about to die. It is such belief that he is about to die, and the fact that, so being about to immediately die, he cannot consequently be cross-examined, which, from public necessity, constitute the legal reasons for the competency of the declaration, looking to its source and nature. All the other considerations, it seems to me, are questions of general competency of the testimony in the particular respects indicated, applicable, equally and for the same reasons, to the like kind of testimony offered to establish any other proper issue in any given case.

In this case I think the legal predicate for the admission of the dying declaration was abundantly shown. And now as to the competency of the dying declaration. It is in these words: "He said he had been dead, and that he was going to die, and the good Lord had sent him back to tell me that Dr. Lipscomb had poisoned him with a capsule he gave him that night, and Guy Jack had his life insured, and had hired Dr. Lipscomb to kill him." I think that part of the declaration, that " he had been dead, and that the Lord had sent him back," ought to have been excluded on a specific objection to that end. Here are three statements: (1) "That Dr. Lipscomb had poisoned him with a capsule he gave him that night;" (2) " that Guy Jack had his life insured;" and (3) " that Guy Jack had hired Dr. Lipscomb to kill him." Clearly, that Guy Jack had his life insured is the statement of a fact, and a fact of which he might well have had knowledge. Here is, at least, one clear statement of a fact reasonably within his knowledge. The state-

ment that Guy Jack had hired Dr. Lipscomb to kill him is put
in the form of a statement of fact, but it seems to me clearly an
inference or opinion of the declarant, drawn from other facts
probably within his knowledge.    I am clearly of the opinion,
after the most careful consideration of the authorities, that the
statement "that Dr. Lipscomb had poisoned him with a cap-
sule he gave him that night," is, in its entirety, the statement
of a fact fully within his knowledge, and not, in any sense, an
opinion.   The suggestion in argument that if Stewart knew the
capsule was poison, he knew it when he took it, is a manifest
*non sequitur* to my mind, and a palpable confusion of thought.
It might just as well be said that one who knows he is killed
by a shot from a pistol, did not know it because he supposed
the pistol was loaded with a blank cartridge.   Here, then, is a
dying declaration, part of which is the statement of an opinion,
and part of which is the statement of a fact, known to the de-
clarant at the time.    That part which was opinion was clearly
incompetent; that part which was the statement of a fact, to
wit, "that Dr. Lipscomb had poisoned him with a capsule he
gave him that night," is clearly competent.   I cannot escape
the conclusion that the statement "that Dr. Lipscomb poisoned
him with a capsule he gave him that night," is just as exactly
a statement of fact as would be the statement of any declarant
that some person had shot him or killed him.   He knew that
Lipscomb had given him this identical capsule.   He knew he
had it in his possession up to the time that he took it.   He
knew that he had taken it, and he knew its deadly effect just as
much as one would know the deadly effect of a pistol bullet en-
tering his person.   He would know it better, as of his own per-
sonal knowledge, than any expert physician, who might testify
on a hypothetical state of facts, that he had been poisoned with
such capsule, because he himself felt, and from so feeling,
through the sense of touch, knew, that the capsule was killing
him, while an expert would be giving his opinion that it killed
him, based on such hypothetical statement.   Any process of

reasoning which seeks to distinguish between the statement, "Dr. Lipscomb poisoned me with a capsule he gave me to-night," and "Dr. Lipscomb killed me or shot me," seems to me a refinement not only too uncertain and visionary to serve in the practical administration of justice, but essentially inaccurate. I do not think any amount of reasoning or form of statement can destroy or impair the common sense conclusion that such statement is necessarily the statement of a fact within the knowledge of Stewart, and I shall not pursue it further.

We are brought face to face, then, with the thoroughly established rule of evidence, supported by an overwhelming array of authorities set forth in the briefs of the learned counsel for the state, that where a part of a dying declaration is competent, as the statement of a fact, and part not so competent, the whole is properly admitted, unless the defendant, by specific objections, points out, and asks the trial court to exclude, the objectionable parts. In this case the objection was twice presented —once before the court on a preliminary investigation, and once when offered before the jury—and, in both cases, it was, clearly and indisputably, nothing more than the merest general objection to the whole of the dying declaration as incompetent, without the specification of a single ground of incompetency, and without pointing out the part which was objected to as incompetent. It will not do to say, because the jury retired, and the objection was fully argued before the court, that we can assume that, in that argument, counsel made specific objections on the ground of opinion or otherwise. We look, to see the specific objections urged to the testimony, not to the argument of counsel, but to the objections the record itself sets forth as having been made; nor would it help the appellant if we did look to the bare statement that it was argued, for the argument is not set forth, nor is it stated that in the argument any specific objections were made. The unequivocal declaration of the record is that the objection was made in the merest general form and argued as such. If this court is to supply the omis-

sions of counsel to comply with the settled rule of evidence demanding that specific objections shall be made, so that the trial court may have a fair opportunity to deal with the objections, and so that this court may fairly review the rulings of such trial court on such specific objections, and imagine or conjecture that counsel, in their argument, presented to the trial court objections the record does not disclose, we upset the order of legal procedure, and embark on a most uncertain sea. It would never be possible to escape hereafter the point, when urged, that though.specific objections had not been made, as shown by the face of the record, yet the court should presume, when the record says merely that the objection was argued, that the trial court had the benefit of a specific objection, for the first time really disclosed in this court. I cannot assent to such a proposition.

In *Lambeth* v. *State*, 23 Miss., 322, it was held by the court, through Judge Yerger, that, if so grave a matter as the constitutionality of the competency of dying declarations was not presented in the trial court, this court would not regard it, when made here for the first time; and whether that be a sound declaration as to a constitutional objection or not, it is surely the most positive alignment of this court with courts elsewhere, which hold that, if the specific parts of a dying declaration, objected to as not competent, are not pointed out by specific objections in the court below, this court will not here regard such objection, disclosed here for the first time.

Merril's case, cited in the opinion of my brother Magruder, was a case where the attorney-general confessed error, practically, and the point here discussed was not presented. We all concur in the rule that the whole of a dying declaration will be properly admitted, unless the parts of it which are objectionable are specifically pointed out in the court below, as the true rule. If it be possible that in some capital case in the future, to enforce the rule strictly would result in imposing the death sentence by the mere rule itself, where, from other testimony in

the case, and the conduct of the trial, this court could clearly see that grave injustice would be done, in such rare and occasional case, in the future, the court might properly shrink from the enforcement of the rule, acting upon the doctrine that rules are made to secure and not to subvert justice; but in a case like this, where, as I view it, the testimony, aside from any dying declaration, shows the defendant to be guilty beyond every reasonable doubt, there can be no reason for departing from the rule. There is no reasonable hypothesis on the testimony in this case consistent with anything else than the manifest guilt of this defendant, and the enforcement of the rule, therefore, secures, and does not subvert, justice, protects society, and deters others from the commission of like offenses. To substitute the judgment of a particular court in the enforcement of this rule in an occasional case, even for the settled rule itself, is obviously dangerous practice.

It was said in *Brown* v. *State*, 72 Miss., 97 : "It is not permissible for one to experiment with the court by consenting by silence to all the evidence of a witness, and then move to exclude all the evidence because some part was incompetent. All the evidence was competent, except in the one particular already adverted to, and this, no doubt, the court would have excluded if attention had been called to it by a specific objection. To have excluded all the evidence would have been palpable error, and this is what the court was asked to do, as we suppose." In this case it is beyond supposition, it is a fact shown by the record, that the defendant asked the court to exclude all of the dying declaration, when, as I and my brother Thompson think, that part of it, to the effect that "Dr. Lipscomb had poisoned him with a capsule he gave him that night," was clearly competent as the statement of a fact. To the same effect, precisely, is *Heard* v. *State*, 59 Miss., 545. I think, therefore, there was no error in this case in the admission of the dying declaration, because the objectionable parts were not sufficiently pointed out, and because it is a case in which the

guilt of the defendant is overwhelmingly manifest by the other testimony in the case.

I desire to add that I think the rule announced in *State* v. *Williams*, 67 N. C., 12, to the effect that the court should allow the dying declaration to go to the jury as the statement of a fact, and not of an opinion, where it is, from all the circumstances attending the declarant at the time of the killing, reasonably probable that he had knowledge of what he states as a fact, is a correct rule. The mere form of a declaration is not conclusive as to whether it is the statement of a fact or of an opinion, for that is form, and not substance. But where the circumstances attending the declarant at the time the facts occur about which he speaks, to wit, the killing and its *res gestæ*, are such as reasonably and probably demonstrated that he was speaking from knowledge, and not from opinion, such circumstances are of substantial value in showing that the statement is one of fact, and not one of opinion. Grant that the circumstances established, showing that he probably had knowledge, are true—made out by the proof in the case—they then are established realities, and declarant's statement may be of a fact made known to him by these realities—as, for example, that he saw or heard, or in any other way identified, the party killing him. In the Williams case, for instance, the murderer had gone out a few minutes before the killing, from the house, but the other proof showed clearly that he was lingering about the house, in the dark, eavesdropping; that there was a brilliant light in the house; that the deceased was lying on his back, with his legs stretched out, on the floor, wide apart from each other, directly fronting the door, within about five feet from the door; that the door was open; that the light from within the house would disclose objects some distance from the door; that the defendant was shot through this open door, by the party standing only a few feet from the door, and was shot straight through the body, between the legs; and the court held that it was altogether probable that the deceased saw

the party by the light in the room and the flash of the gun, and that he heard the party moving about. These circumstances were established facts in the case, and the court, looking to these established facts, said that it was altogether probable that the deceased did see and hear, and thus identified his murderer, and hence that the statement was one of a fact reasonably within his knowledge, and the rule announced was, that where the statement is one of a fact, shown by the surrounding facts, fully established, to have been reasonably within his knowledge, it is to be held as the statement of a fact, and not of an opinion. Altogether different is it as to the mere form in which a declarant couches his statement. In such latter case the form of statement should not control, and the reason why it does not control is that the court does look through the form to the substance, to wit, the circumstances showing whether he had reasonable knowledge of the fact he states. The very reason why the mere form of the statement is properly held not to be conclusive, is that the court sees that it is an opinion, and not a fact, by looking to the other established circumstances in the case. The very inquiry the court institutes for itself, in determining its admissibility, as to whether opinion or statement of fact, is, was such statement, notwithstanding its mere form, shown by the established circumstances in the case, to have been one of fact reasonably within the knowledge of the declarant, or one of opinion merely? It seems to me clearly beyond controversy, therefore, that it is the proper test precisely to ascertain whether the established circumstances in the case show that the statement was one of a fact reasonably within the knowledge of the declarant, or one of opinion merely, whatever the mere form of the statement may be. The form of the statement is form only. It may be falsely couched in the form of a statement of fact purposely, but the established circumstances go to the vital substance of the question whether the declarant, situated as the circumstances show him to have been situated as to the exercise of his senses, and his ability by the

use of his senses to identify his assailant, did reasonably have knowledge of the fact which he states as a fact.

I desire further to say that 1 take no part in the criticism of *Payne* v. *State*, 61 Miss., 161. The statement in that case was to the effect that the defendant " shot him without any cause whatever," and the criticism is of the court for holding that the words " without any cause whatever " is the statement of a fact, and not of an opinion. There is not in this case any statement by Stewart that Lipscomb killed him " without any cause whatever; " and, hence, the whole criticism of the opinion seems to me clearly beside the issue in this case. Stewart's statement was that Lipscomb had poisoned him; that he killed him with a capsule he gave him that night; and this is like the statement of Hawkins in *Payne* v. *State*, 61 Miss., 161, that Payne had " shot him," and is the statement clearly of a fact within the knowledge of the declarant. For the reason, therefore, that the statement of Stewart does not contain the declaration that Lipscomb poisoned him " without any cause whatever," it seems to me foreign to the issue to discuss the question as to whether the words " without any cause whatever " is the statement of an opinion or of a fact.

Finally, I desire to say that I very much doubt the correctness of the decision in *Com.* v. *Matthews*, 89 Ky., 287, and in *Handy* v. *Com.*, cited in the opinion of my brother Magruder, in so far as they hold that the statement there, to the effect that the shot was an accident, was admissible for the defendant, but not for the state. Without committing myself one way or the other, definitely, as to whether the competency of any dying delaration is to be determined, in any case, by the consideration that it was for the defendant, and not against him, I will say that such a distinction seems to me untenable. I cannot see how the competency of a dying declaration, any more than the competency of any other testimony, is to be determined by whether it makes for or against the defendant. It would seem that, if it were competent, it should go to the jury, no matter

against whom or in favor of whom it operated. I think the verdict would have been well warranted if there had been no dying declaration at all, and the essential part of the dying declaration — the statement that "Dr. Lipscomb poisoned him with a capsule he gave him that night"—was clearly competent, and should have gone to the jury, in any event.

I think the fifteenth instruction asked by the defendant should have been given, on the authority of Lambeth's case, 23 Miss., 322. It might have been more felicitously phrased. It might have told the jury that, in considering the dying declaration, it was proper for them to remember that, as to its source and nature, it was the declaration of one not sworn and not cross-examined, but that, remembering this, they alone had the power to graduate its weight and effect as testimony; and this is what I think it does, though not as felicitously as it might have done. But I do not think the refusal to give it was reversible error.

The ninth instruction for the state, I think, is erroneous for the reasons given in *Williams* v. *State*, 73 Miss., 820 but I do not think that is reversible error, since the jury were abundantly instructed as to reasonable doubt and as to the value of circumstantial evidence. The giving of the instruction in the Williams case was not reversible error of itself alone— it operated as a mere make-weight. That case, as the reading of it discloses, was reversed for the admission of incompetent testimony.

It will thus be seen that I think two instructions—one refused the defendant and one given the state—are erroneous, but that I do not regard these errors, singly or combined, as constituting reversible error; for the reason that I think the testimony, which was competent, overwhelmingly establishes the guilt of the defendant, that the right result has been reached on the facts and the law applicable to the case, as it went to the jury, and that no other result could be reasonably reached by any jury on another trial, and hence that substantial justice has been done between the state and the defendant; and, wherever such is the

case, I understand the rule to be settled beyond cavil, in this state and a majority of other states, that no new trial should be granted.

In 1 Thomp. Trials, p. 122, sec. 116, it is said: "In England and many American jurisdictions a paramount inquiry upon such objection is whether it has resulted in an unjust verdict. If not, the objecting party has sustained no injury, and a new trial will not be granted in order that public or private time may be consumed and the danger of other, irregularities incurrrd, where the same result must, on a just view of the evidence, be reached. Unless there is plain evidence of injustice done to the party complaining, the verdict shall be allowed to stand." In 2 Thomp. Trials, secs. 2401, 2402, considering the express point here involved—the giving of erroneous instructions—it is said: "Courts of error do not sit to decide moot questions, but to redress real grievances. It is therefore a rule of nearly all the courts that no judgment will be reversed on account of the giving of erroneous instructions unless it appear probable that the jury were misled by them. Expressions of this rule could be multiplied almost without limit. Thus, it is said that instructions faulty or technically erroneous will not work a reversal of the judgment if the jury were not misled, or if, as a whole, the case was fairly presented to them, and especially if their verdict is obviously correct. Of course, it can never be said that the jury were misled by the giving of erroneous instructions where they have reached the correct result by their verdict. Accordingly, it is the practice of most of the courts, before passing upon exceptions to instructions, to look into the evidence and see if the verdict is right, and, if it is found to be so, the court will look no further. The rule of these courts is that a good verdict cures all errors in the intermediate steps by which it was reached. In England it is no ground for a new trial that the judges misdirected the jury, unless it is shown that the jury was thereby induced to form a wrong conclusion. If the revising court sees that justice has

been done between the parties, they will not set aside the verdict nor enter into the discussion of the questions of law." And Mr. Thompson in his notes arrays decision after decision from this court, showing this court to stand firmly on this rule as necessary to any practical administration of justice. I have examined every one of these authorities, and shall proceed to state what they hold, among them being decisions in criminal cases, and shall then add others from this court down to date.

In *Magee* v. *Harrington*, 13 Smed. & M., 406, the court say: "The verdict of the jury was correct, according to the law and the facts, and, if it were conceded that the court below erred in the instruction which it gave, we would not be authorized to disturb it, as there is no probability that a different result would follow upon another trial."

In *Brantley* v. *Carter*, 26 Miss., 285, it is said: "It is well settled that a judgment will not be reversed for erroneous instructions to the jury, if it is apparent that the verdict is according to the law governing the case and the evidence before them."

In *Hanna* v. *Renfro*, 32 Miss., 131, it is said: "The instructions given to the jury upon the trial are very numerous and general in their character, and, in some respects, are not entirely accurate. So far as they are applicable to the material points involved under the facts of this case they appear to be correct, and we are satisfied that the verdict is well sustained by the law arising upon the evidence, and that the errors in the instructions are therefore immaterial."

In *Fore* v. *Williams*, 35 Miss., 540, speaking of instructions, the court say: "This was obviously irregular and improper; but it appears that the jury came to a correct conclusion upon the subject, and, as the error in the court did not operate to the defendant's prejudice in law, it was no ground for setting aside the verdict and granting a new trial."

In *Wesley* v. *State*, 37 Miss., 351 (a murder case), the court say: "But it is not for every error committed by the circuit

courts in charging or refusing to charge the jury that this court will reverse. It is only after an examination of the whole record, and when it appears that the party complaining has either been injured, or may have been injured, by an erroneous instruction, that this court will interpose and correct the error.''

In *Cameron* v. *Watson*, 40 Miss., 209, after holding instructions to be erroneous, the court say: ''But no injury was done by it, for the verdict is correct, notwithstanding the erroneous instructions. In such a case the error in the instruction is not ground for granting a new trial, where it is manifest the verdict is correct upon the facts appearing in the record.''

In *Hanks* v. *Neal*, 44 Miss., 227, 228, it is said: ''Although this instruction, as a legal proposition, may not be correct, yet, as the evidence shows that the verdict is right, there is no error in overruling the motion for a new trial. The rule is that the verdict will not be disturbed when it is according to law and the justice of the case, though the instruction be erroneous.''

In *Head* v. *State*, *Id.*, 752—a murder case—the court said: '' We would not disturb the verdict for any supposed error in the instructions, when the verdict is manifestly right on the evidence, and it does not appear that the accused was prejudiced by any one of the charges of the court.''

In *Evans* v. *State*, *Id.*, 775—a murder case—the court said: '' It has been several times declared from this bench that all the charges are to be construed together, as of *pari materia*, one as modifying another, so as to see whether, as an entirety, they correctly lay down the law, and, if so, although a single instruction may be too broad in its terms, a reversal ought not to take place. The rule as deduced by Wharton from American cases is, if the error be immaterial and irrelevant and justice has been done, the court will not set aside the verdict nor enter into a discussion of the questions of law.'' Am. Cr. Law, sec. 3080. '' It finds full support in the adjudications of this court,'' citing authorities.

In *O'Leary* v. *Burns*, 53 Miss., 171, it was held, Simrall,

C. J., speaking for the court, "that, where there is competent evidence sufficient to support the finding, the judgment will not be reversed for an error in admitting testimony." The same doctrine precisely was announced in *Witkowski* v. *Maxwell*, 69 Miss., 66 the court saying: " We cannot say that the verdict of the jury, by which it is settled this was done, is not supported by competent evidence from which this inference follows; " and in *Barnett* v. *Dalton*, 69 Miss., 617, the court saying: "We decline, moreover, to reverse, because another trial, properly conducted, could only result in a judgment for the appellees on the evidence before us." Here are three cases holding that where the verdict of the jury is right on the law of the case, and the competent evidence in the case, it will not be set aside. There is therefore nothing in the suggestion that this court, if it affirms a judgment where incompetent testimony has been admitted, but the verdict is right on competent testimony, is usurping the function of the jury to say whether the defendant is guilty or innocent. That function, of course, is primarily for the jury; but this court undoubtedly has the power, in ascertaining whether the verdict of the jury is right, to uphold that verdict as being right on the competent evidence, under the law of the case.

In *Cheatham* v. *State*, 67 Miss., 341, this court well said: "The standard sought to be erected by counsel, by which to test a fair and impartial trial, to which one accused of crime is entitled, is too perfect and refined. It excludes not only appreciable error, but invades the field of metaphysics, and invites investigation of subjects with which neither courts nor juries are competent to deal. Courts must consider juries as bodies of plain men, imbued with an honest desire to perform with fidelity the duty imposed upon them of discovering the truth from the evidence submitted to them, in conformity with the instructions as to the law given them by the court."

In *Graham* v. *Fitts*, 53 Miss., 307, this court said, through Campbell, C. J.: "Some of the charges given by the judge to the jury, given at the instance of the plaintiffs and the defend-

ants, were erroneous. . . . We will not particularize, but will give our view of the case as made by the record as a whole. . . . We think that a proper result was reached in the trial, although by a different method from that indicated in this opinion; and as, upon the facts of the case, defendants in error were entitled to the judgment they obtained, it is affirmed.''

In *Lamar* v. *State*, 65 Miss., 95, 96, this court said: '' But this was not the only infringement of the right of the defendant. In his concluding argument the district attorney, over the objection of the defendant, in spite of the twice - repeated direction of the court to desist, persisted in reading to the jury, as evidence against the accused, certain portions of the written testimony of a witness, which had not been put in evidence. Thus, each of the counsel for the state invoked against the accused prejudicial facts not in evidence. Such conduct deserves the severest censure, and should have drawn from the court an instant and sufficient correction. For this palpable and serious error we are urged by the counsel for the appellant to reverse the judgment and award a new trial.'' But the court held that the defendant was guilty on his own testimony, and affirmed the judgment, notwithstanding these serious errors. Exactly the same point is decided the same way in *Allen* v. *State*, 66 Miss., 388. These cases go upon the ground that this court should affirm the verdict of the jury finding a defendant guilty, where this court, passing upon the testimony of the defendant himself, sees that it makes him guilty. There can be no logical difference between the power of this court to hold the verdict of a jury finding a defendant guilty right where his own testimony satisfies this court that he was guilty, and in affirming the verdict of a jury finding a defendant guilty on other uncontradicted testimony in the case, this court believing him guilty on such uncontradicted testimony. I do not mean to say that, in this case, the testimony showing guilt, other than the defendant's own testimony, is not contradicted in some respects. I

am speaking now of the power of this court to base its affirmance upon the fact that the defendant is guilty under the law, either on his own testimony or on other testimony showing his guilt beyond a reasonable doubt, though there be contradictions in the testimony. The various decisions which I have cited on this particular point indisputably show that this court has the right to look at the substantive case made by the competent testimony—the mountain in the landscape—and to uphold the verdict based on such competent testimony, under the law applicable to the case, though incompetent testimony may have gone to the jury improperly.

Again, it has been held, in *Houston* v. *Smythe*, 66 Miss., 123, Campbell, J., speaking for the court, that, where the right result has been reached, errors of law as to pleadings will not cause reversal. The court said: "The court erred in sustaining the demurrers, but the whole case was fully developed by evidence, and any other result than the defeat of plaintiff in replevin would not be tolerated. In such case it would be wrong to keep alive a controversy which, since, under the law, it could have but one end, had better at once be terminated. Therefore, following numerous precedents, we will not inflict upon the party ultimately losing the cost of further and useless litigation, by remanding the cause because of errors and rulings in the pleadings, since it is manifest that no harm was done by these rulings."

See, also, supporting the general doctrine announced, *Vance* v. *State*, 62 Miss., 137; *Cheatham* v. *State*, 67 Miss., 341; and *Vicksburg L. & T. Co.* v. *United States Express Co.*, 68 Miss., 149. With these authorities in our mind, this court has recently declared, in the case of *Ellerbe* v. *State*, *ante*, p. 523, the rule to be as follows: "So far as the lawful power of this court can be exerted in affirming convictions for violations of the law of the land, it shall be exerted; and mere technical errors, without intrinsic merit, where we can, after a careful and thorough examination of the whole case, confidently say that the right result has been reached, that

substantial justice had been done, and that, on a new trial, no other result could be reasonably arrived at, will not avail here for reversal in civil or criminal cases.'' It must thus be clear, beyond all cavil, that this appellate tribunal is not a helpless prisoner, bound in the fetters of some supposed hard and fast rule requiring it to reverse cases where, first, erroneous instructions have been given; or, second, proper instructions have been refused; or, third, competent testimony has been excluded; or, fourth, incompetent testimony admitted; or, fifth, improper argument has been allowed; or, sixth, the trial court has erred in its rulings on the pleadings, on the ground, merely, that such action of the court, of the one kind or the other, constitutes error in law, merely. Every one of these propositions is laid down as settled law, and an overwhelming array of authorities, from this and other states, is cited in support of each in 2 Enc. Pl. & Prac., as follows: Paragraph 12, p. 499; paragraph 4, p. 534; paragraph 5, p. 537; as to improper remarks of court or counsel, *Id.;* as to errors in pleadings, paragraph 6, p. 542; as to improper rulings of, in admitting or excluding testimony, paragraph 7, p. 549; as to erroneous instructions or refusal of proper ones, paragraph 8, p. 567; and, finally, it is said (paragraph 10*d,* p. 587): '' Where it is clearly apparent that the verdict is correct upon the whole evidence, judgment will not be reversed for errors occurring in the trial; '' and in paragraph 8*c,* p. 400, it is declared: '' There is no distinction in the application of the principle between civil and criminal cases.''

With all deference, it seems to me that my brethren have clearly confounded the primary function of the jury to pass on the evidence and find the defendant guilty, if satisfied beyond a reasonable doubt, and the power which this appellate tribunal exercises in reviewing that finding of the jury. When the court so reviews the finding of a jury in a criminal case, and reverses, as it repeatedly has done, on the sole ground that the evidence was manifestly insufficient to warrant the verdict of

guilty, or affirm the jury's finding of guilt when that verdict is clearly right on the law applicable to the case and the competent testimony in the case, as it has also repeatedly done, this court is not usurping the jury's primary function, and passing originally upon the guilt or innocence of the defendant, but is manifestly exercising its undoubted appellate power of reviewing and upholding or vacating the finding of the jury, as the case made may demand, in accordance with settled rules of law governing appellate jurisdiction. The practical inquiry is the true inquiry, and the practical inquiry must always be, as stated in Ellerby's case, founded on all our other cases, sanctioned by the text of Mr. Thompson—itself a mere restatement of the decision in a majority of the states in this Union, and of the courts in England—that where this court, looking back through the whole record, notwithstanding such errors of law, can confidently affirm—as it has a right to affirm, and must of necessity have the right to affirm—that substantial justice has been done, and that the right result has been reached on competent testimony under the law applicable to the case, and that no other reasonable verdict could be rendered than the one which was rendered, a reversal should not follow. The administration of justice is a practical thing. It should be administered in a practical way, so as, while not denying to any defendant any substantial right to which he is entitled by the law of the land, to protect society from violators of the law, and to secure the punishment of guilty men properly convicted.

In view of the fact that a majority of the court think this defendant should have a new trial, I refrain from any particular detailed statement of the testimony in the case, not wishing in any wise to prejudice him on the new trial. I say, only in vindication of my views, that on the testimony in this case, without reference to the dying declaration, he is, to my mind, shown overwhelmingly to be guilty, and that that part of the dying declaration, " Dr. Lipscomb poisoned me with a capsule he gave me to-night," was the statement of a fact, and was

competent to go to the jury, as it did go to the jury, and that Dr. Lipscomb's conduct, as disclosed by the record, is, to my mind, utterly inconsistent with his innocence.  Murder is bad enough in any form (assassination is one of its worst forms), and the poisoning of a patient by his physician is a form of assassination darker in its type than I care to characterize. Mississippi wants no ''Age of Poison.''

For these reasons I feel constrained to dissent from the conclusion reached by the majority of the court, that a new trial should be granted.  I think the judgment should be affirmed.

THOMPSON, Sp. J., delivered the following opinion, favoring a reversal of the judgment appealed from:

In reference to the questions pertaining to the dying declaration, I concur in Judge Whitfield's opinion.  The statement, a part of the dying declaration, '' that the Lord had sent him back to tell,'' if objected to, was inadmissible, just as a declaration to a jury by a living witness, to the effect that '' the Lord had sent him to tell them,'' preceding a narrative of facts, would be inadmissible.  The statement '' that Dr. Lipscomb had poisoned him with a capsule he gave him that night '' was, in a just and legal sense, the statement of a fact, and not the expression of an opinion, and it was admissible in evidence. The statement that '' Guy Jack had his [the declarant's] life insured '' was the statement of a fact, but it was not admissible in evidence, because not a part of the *res gestæ* of the homicide. The concluding part of the declaration, '' and [meaning Guy Jack] had hired Lipscomb to kill him '' (the declarant), while, in form, the declaration of a fact, yet, in truth, as we find from all the surrounding facts and circumstances, was but the expression of an opinion, and was not a part of the *res gestæ* of the homicide, and it was inadmissible.

In my opinion, the court below erred in granting the second and ninth instructions given for the state, and I concur in the opinion of Judge Magruder in so far as it points out the error

of the ninth instruction. I think, too, that the court below erred in refusing the fifteenth instruction asked by the accused, and I concur in the opinion of Judge Whitfield approving this instruction and pointing out the error of the court below in refusing it. I am of opinion, because of these errors, the judgment appealed from should be reversed. I cannot consent to an affirmance of the conviction of appellant with these errors, to his prejudice, apparent of record. Especially do I regard the action of the court below, in granting the ninth instruction for the state, as reversible error. Other convictions, because of like errors, have been vacated by this court, and I find no sufficient basis for a different result here.

It may be that public policy would be promoted by the existence of authority in the judges of this court to determine, in every criminal case, whether, upon the facts of the case, the appellant be guilty or innocent, and, if believed by them to be guilty, to affirm a judgment of conviction in spite of errors committed on the trial in the court below; but I do not understand such power or right to exist. I find no warrant for it in authority, and I do not believe that it ought to be brought into existence, if at all, save by legislation. I think the first inquiry in respect to every assignment of error should be, is it well taken—was error committed in the trial appealed from to the prejudice of appellant in the matter complained of? If this inquiry is answered affirmatively, then the second inquiry presents itself, and that is, was error calculated to and did it probably produce the result evidenced by the judgment appealed from? If this is to be answered in the affirmative, then the case should be reversed. Appellate judges, under existing law, cannot too carefully refrain from becoming themselves the triers of the fact of guilt or innocence in determining whether an error committed by the court below was calculated to and did probably produce the result there reached. The two questions are certainly separate and distinct. In this case I cannot see how it can be affirmed that the errors in the instructions

(all agree that there are errors in them) were not calculated
to and did not probably produce the conviction appealed from.
Admitting, as a matter of law, that Lipscomb ought not to
have been convicted unless, in the belief of the jury, his guilt
was established beyond a reasonable doubt, and that "full
conviction" is something less than ·the degree of certainty of
belief required to warrant a conviction, as has been decided by
this court ( *Williams* v. *State*, 73 Miss., 820), how can it be
said with certainty that the instruction did not produce the
verdict?    The instruction here is that "when, after due caution,
this result [meaning full conviction of defendant's guilt] · is
reached, the law authorizes the jury to act [meaning to convict]
on it."    In the Williams case, *supra*, the instruction which was
condemned was: "If, after a careful and impartial considera-
tion of all the evidence in this case, you can say and feel that
you have an abiding conviction of the guilt of the defendant,
and are fully satisfied of the truth of the charge, then you are
satisfied beyond a reasonable doubt," etc.    It will be noted
that "abiding conviction" and "full satisfaction" are con-
jointly, not disjointly, coupled in the instruction in the Williams
case.    If, as decided by this court, "an abiding conviction,"
united with "full satisfaction" of a defendant's guilt in the
minds of his triers, falls short of the legal standard of certainty·
of proof required to authorize a verdict of guilty, surely a
"full conviction" thereof does not measure up to the standard.
I think Judge Whitfield is mistaken in the statement, in his
opinion just read, that the instruction in the Williams case was
not held to be reversible error.    The Williams case, as I read
it, was reversed because of the condemned instruction, as well
as because of the admission of incompetent evidence.

As a matter of law, it cannot be said that the ninth instruc-
tion given for the state had no weight, because, as a matter of
law, it is the duty of a jury to carefully consider and to be
governed by the instructions of the court.    Looking at the
question as a matter of fact, it can be said such an instruction—

one upon a vital question in the case, not a mere collateral or
incidental matter—did not probably produce the result only in
cases where the state of the evidence is such as to justify, in
civil cases, a peremptory instruction by the court—cases in
which there is no conflict of pertinent evidence, and in which
all the evidence is consistent with the result directed.   In this
case the testimony of the accused at least denied guilt, and, if
believed by the jury, would have warranted an acquittal; and,
besides, other witnesses testified to matters of fact which, if
true, tended strongly to show appellant's innocence.   Lipscomb,
therefore, has been convicted by a jury who were instructed by
the court that a degree of proof of guilt less than the exclusion
of every reasonable doubt was sufficient to warrant a verdict
against him; his conviction was had when there was evidence
offered on the trial which, if believed, would have warranted
his acquittal—a state of evidence of which a court would not
affirm that a verdict in his favor would have been without evi-
dence to support it; and the question is, shall the judges of
this court disregard the error, and themselves weigh and con-
sider the evidence, without the advantages of observing the wit-
nesses, and determine what would have been their verdict had
they been on the jury?   I can find no warrant for so doing.
If the evidence, the whole of it, was so conclusively one way as
to justify, in a civil case, a peremptory instruction, such an
error as the one we are considering might not be cause of re-
versal; but in the state of the evidence here it must be, unless
appellate judges are to be the triers of facts in cases brought
before them.

I have carefully read and considered the several authorities
cited in support of the idea that this court should affirm the con-
viction appealed from notwithstanding errors, but I do not
think any one of them covers this case, and that this appeal is
distinguishable from all of them.

The writer does not overlook the rule that the instructions
in a cause are to be considered as a whole, but, looking at all

of the instructions in this case, he cannot agree with Judge Whitfield that the jury were fully instructed on the subject of a reasonable doubt. The jury were told that the defendant could not be convicted unless his guilt was established beyond every reasonable doubt, but the ninth instruction said to the jury, in effect, that "full conviction" was the equivalent of the exclusion of reasonable doubts, and it was in every just sense a modification, and an erroneous modification, of all the other instructions on the subject; and, if we give full scope to the rule that the instructions are to be treated as a whole, this erroneous ninth one, given for the state, must be read in the body of each of the others, relating to the question of the degree of proof requisite to a conviction.

After the delivery of the foregoing opinions a motion was made by attorneys for the state to vacate the judgment of reversal which had been entered by order of the court, and to substitute therefor a judgment of affirmance. The motion was argued by counsel.

WHITFIELD, J., delivered the opinion of the court on the motion.

On this motion to vacate the judgment of reversal heretofore entered, and substitute a judgment of affirmance, upon the ground that no two of the judges concur in a common ground of reversal, we have listened patiently to a full and extended oral argument, and have carefully examined all the authorities cited for the state—the Phillips case, the Spivey case, and all the other cases. The facts of those cases clearly distinguish them from this one as to the point here presented for decision. Of course, anything said (and much was so said) as to whether the original holdings of the court were right or wrong, was proper to be made on a suggestion of error. All that, of course, we discard.

The judges remain of the opinions they originally severally entertained. My brethren thought then, and think now, that

Opinion of the court on motion.

the ninth instruction for the state was error, and reversible error. I thought then, and think now with increased confidence, it was not reversible error. The only ground upon which, logically, the motion can proceed is that two judges of the court do not concur on one common ground of reversal. The case of *Browning* v. *State*, 33 Miss., 85, is an authority for reversal where the judges differ, though one of the judges for reversal predicates his judgment on one ground, and the other who may be for reversal predicates his judgment on an entirely distinct ground, and though there may be no two judges concurring in one common ground of reversal. Judge Handy's opinion in that case is said to be a very powerful one, and it certainly is, and, in the judgment of the writer, is the sound view. Without, however, deciding which is the better view—whether two of the judges ought to concur in one common ground of reversal, or whether it be enough that one reached his conclusion that a particular case ought to be reversed on one ground, and another on another—it is sufficient here to say that, even if the opinion of Judge Handy were the law, my brethren here do concur on one common ground of reversal, and reach that common ground on the same line of reasoning. It is immaterial, therefore, whether the views of Judges Smith and Fisher are sound, or the views of Judge Handy. On either view this motion is not well taken, and must be overruled. It affords us at least some measure of satisfaction to be able to say that, however much we may have differed upon other grounds in the case, the court has unanimously reached the conclusion that this motion should be, and it is hereby, overruled.

L. W. MAGRUDER and R. H. THOMPSON, special judges on the trial of the case and the hearing of the motion, presided in places of JUDGES WOODS and TERRAL, disqualified.