## PRESTON JONES *v.* STATE.

[61 South. 979-707.]

CRIMINAL LAW. *Appeal and error. Harmless error. Court Rule* 11. Supreme Court Rule 11 which provides that no judgment shall be reversed for misdirection of the jury or improper rulings on evidence or for errors as to matter of pleading or procedure, unless it affirmatively appear from the whole record that such judgment has resulted in a miscarriage of justice, comes to us from the common law and in slightly different language is now enforced in many jurisdictions by virtue of statutes, rules of court or judicial decisions and was followed in this state before the adoption of this rule.

APPEAL from the circuit court of Hinds county.
HON. W. A. HENRY, Judge.
Preston Jones was convicted of unlawful retailing and appeals.
The facts are fully stated in the opinion of the court.

*Louis C. Hallam,* for appellant.

The only ground on which I can account for the decision of this court is that embraced in supreme court rule 11, and I cannot combat that rule and its unsoundness more forcibly, or in language more respectful and logical than that employed by that eminent and distinguished lawyer, the Hon. R. N. Miller, in his recent address as president of the Mississippi bar association. He says in part:

"By rule 11, the supreme court announces: 'No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for error as to matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice.' I most respectfully submit for the serious consideration of the bar of Mississippi that this rule, literally interpreted, applied even by so able and fair-minded a court as now composes that august tribunal, is in fact revolutionary.

"No misdirection to the jury whatever, even though it be vital to the case, or even though the court should decline to define the rules of law by which the jury should apply the testimony; no improper admission or exclusion of evidence; no error of pleading or procedure (in either civil or criminal cases) shall reverse any case unless the judges think a miscarriage of justice has resulted.

"I feel confident that no particular harm or danger can overtake any litigant perhaps, at the hands of the present justices, so just and kind-hearted as I know them to be, but by these rules the supreme court is making history. There is no telling how in the near future this rule may be applied, and I respectfully submit that the legislature, under our constitution, has no power to give effect to any such principles as are announced by this rule. It sweeps away at one fell swoop the doctrine of *stare decisis* which lies at the very foundation of the justice of all jurisprudence."

Mr. Sharewood in his essay on Professional Ethics has said of this great doctrine: " 'As well in the domain of public as of private law the great fundamental principle for which our concern ought to be is that authority is sacred. There is no inconvenience so great, no private hardship so unbearable as to justify the application of a different rule to the resolution of the case than the exist-

ing state of the law will warrant. 'There is not a line
from his pen,' says Mr. Binney of Chief Justice Tilgh-
man,' that trifles with the sacred deposit in his hands by
a decision according to a private opinion, or what 'he
thought' it ought to be. Judicial legislation he abhorred;
I should rather say dreaded, as an implication of his
conscience. His first inquiry in every case was of the
oracles of the law for their response, and when he ob-
tained it, notwithstanding this clear perception of the
justice of the case, and his great and intense desire to
reach it, if it was not the justice of the law he declined
to administer it. He acted on the sentiment of Lord
Bacon 'that it is the foulest injustice to remove land-
marks, and that to corrupt the law is to poison the very
foundations of justice.'

"Again the same author says: 'Judicial legislation is
much worse than legislative retrospection in another re-
spect. The act of the legislature if carefully worded is
at least a certain rule. The act of the judicial legislature
is invariably the precursor of uncertainty and confusion.
Apply to it the test which may be set down as unerring,
never failing soon to discover the true metal from the
base counterfeit: its effect upon litigation. A decision
in conformity to establish precedents is the mother of
repose in that subject; but one that departs from them
throws the professional mind at sea without chart or
compass. The conscientious counsellor will be compelled
to say to his client that he can not advise. One cause is
the general uncertainty to which it leads. Men will per-
suade themselves easily when it is their interest to be
persuaded, that if one well established rule has been over-
thrown, another believed to be quite as wrong and per-
haps not so well fortified by time and subsequent cases
may share the same fate. The very foundations of con-
fidence and security are shaken. The law becomes a lot-
tery in which every man feels disposed to try his
chance.'

"The constitution guarantees every man charged with crime the right to be charged by an indictment which will inform him of the exact nature and cause of the accusation against him—to have a public trial by a fair and impartial jury; it guarantees every man, however humble, in every case, either civil or criminal, a fair trial according to the law of the land. Every citizen is entitled to due process of law, which means a trial according to the law of the land.

"I fear the zeal of the judges to reform the so-called law, blinds them to the infinite value of all these safeguards of constitutional liberty. Every lawyer and every student of history knows that it is infinitely more important (to preserve these safeguards untrammeled than) that any number of criminals shall be punished.

"These legal doctrines and principles, as venerable and indestructible as the common law itself, doctrines that arise in every trial wherever the common law prevails, have stood by accused persons for very many centuries. In fact, our Anglo-Saxon ancestors brought them from the wild, unbroken forests of Germany, and in all the darkest hours of passion and vengeance and prejudice, they have placed hope and life where otherwise death and dispair ruled supreme. They are the very spirit of the ancient common law that survived the Danish invasion; they have outlived the Norman conquest, and have come to us over the waste of ages to make you and me free.

"A citizen of Mississippi may be denied any one of these rights and convicted on hearsay evidence, or evidence wholly illegal or inadmissible, and yet if the honorable judges think on the whole record he is guilty of some crime, though not the precise one charged against him, or, to put it in the other way, unless his innocence is manifest from the record, a conviction must be affirmed. A judge in one part of the state interprets the law in one way, and another judge in another part of the state

in a different way, and yet both cases must be affirmed unless it appears to the judges of the supreme court who read the cold facts on the records, in a case of disputed facts too, that a miscarriage of justice has resulted.

"The rule enforced and applied literally would produce a condition of judicial tyranny from which the state would revolt. It was the birth of these great principles of freedom, and the refusal of the judges to enforce them that caused King Alfred of England to have forty-four of his judges to be hanged in one year because of their false judgments in this particular.

"The true rule must be that a miscarriage of justice has already resulted when the case has not been tried according to law, and the only business of the supreme court of Mississippi has heretofore been and ought to be to see that this error is corrected. Any other rule will bring chaos and confusion worse confounded. Infinitely preferable would it be to abolish our ancient system and make the jury judges of the law and the facts, and let the jury with the aid of law books be the final arbiters of both."

*Frank Johnston,* assistant attorney-general for the state.

There are four questions discussed by counsel for appellant:

1. The question of the competency of Davis' testimony.

2. The asking by the district attorney of the question of the defendant if his wife had been tried or convicted of a similar offense at this term of court.

3. The leading question asked directly by the court of witness Davis.

4. Whether the sheriff exposed the jury to improper influences and threw suspicion against the verdict rendered in the case.

I will discuss these questions in the order presented.

The testimony of Davis, the policeman of Jackson, instructing these two detectives to go to the house of defendant, and make a search for whiskey was only a preliminary matter. Counsel argues that this witness was permitted to testify in regard to his suspicions, that the wife of defendant was engaged in liquor selling; but upon careful examination of his testimony, I do not find such a direct statement as this and therefore the proposition of counsel is more an inference which he draws from the statements of the witness than any expression on the subject by the witness. Of course, it appears from the testimony of Davis that he instructed these two detectives to make the search, but at the same time it is equally true that the witness did not state any suspicion that he entertained on the subject. I respectfully insist to the court as a proper question to be considered whether or not it is not competent for the court to show as a fact that these two detectives had been authorized and directed by this policeman Davis to go on the expedition to the appellant's house. It does not necessarily involve the question of the guilt or innocence of the appellant, but is simply an explanation of why these officers went to the house on this afternoon or this night to search appellant's premises for liquor.

So far as this testimony is concerned, therefore, on this rule it may well be held to be competent evidence explanatory of the object of this searching expedition by these two detectives. The argument of counsel however, goes further than this however, and goes to the proposition that these officers had made a memorandum, or rather that Lee had made a memorandum just after the occurrence, to the effect that their visit was about 4:30 p. m., instead of 9:30 p. m., as testified to by both of them on the witness stand. It is shown in the case that the defendant was not at home at 6 o'clock on the 6th of November, 1912, or at 4:30. The argument of counsel now is that, permitting Davis to testify that he had sent these detectives

there on the 6th of November not at 4:30 but at dark, and at night, was an effort by incompetent testimony to corroborate the testimony of these two detectives, that the time of their visitation was 9:30 at night instead of 4:30 according to their own memorandum, and the argument further is for this reason, that the change was made in the notation in the memorandum book, with reference to the time of the visit.

I do not concede that this is a correct technical view of the legal rule of evidence as applicable to this case. If it was proper for Davis to have stated, in the first instance, that he instructed these detectives to go to this house that day and make a search for whiskey it was equally competent for the court to permit him to state what time he sent the detectives to the appellant's premises. It may have had the effect before the jury of corroborating to some extent the testimony of these detectives, but it would not be incompetent evidence on this account alone, for in the first instance, it was proper and competent evidence on the fact that he had sent the detectives there to search the premises.

It is true that the district attorney on the trial asked the appellant if he had not been tried and convicted at the same term of court for a similar offense, but the fact is to be especially noted that the objection made by appellant to this question was at once sustained by the court and no answer was permitted by the court. The argument of counsel is not that this proposed evidence was admitted, but simply that this question was asked by the district attorney. I must respectfully insist that this view of counsel is far-fetched, and without a correct legal basis to rest upon. The propounding of a question by which it is sought to elicit illegal testimony, objected to at once, and excluded by the court, cannot be ground for error, nor urged as reversible error to this court. This occurrence may take place many times during the progress of the trial. Nothing is more common

than that incompetent evidence is offered by both sides during the progress of a trial and is excluded by the court, but the mere proffer of this illegal evidence does not constitute an error on the part of the trial court, and cannot possibly afford ground for reversal of the case.

I concur with counsel in the impropriety of the question. I concur fully with the view that it was wholly incompetent to show that defendant's wife had been indicted, tried or convicted for a similar offense at this term of court, and the action of the court in excluding the question and not permitting an answer to it, was entirely correct, and moreover this is all that the trial judge could have done under the facts and circumstances presented by the propounding of this question. Moreover, I do not desire to take a refined, or over-strained technical view of this point, and in this connection, I desire to observe to the court that as a matter of justice, and as a matter of giving the appellant a fair trial in the case, I cannot see how an intelligent jury could have been prejudiced against the defendant, by the fact that the district attorney had improperly propounded this question to the witness. I should rather incline to the view that the jury, if it had any effect whatever, would have rather been prejudiced against the state and the district attorney's method of conducting the prosecution by propounding an improper and illegal question, than that they should have been prejudiced against the defendant.

However that may be, it is simply impossible in the progress of criminal trials that every improper question can be prevented in advance, or that the court can by any possibility prevent the proffer of evidence on either side which is incompetent. When an improper question is asked, all that the court can do is to exclude the question, and upon a proffer of incompetent evidence, all that the court can do by any possibility is to exclude the incompetent and inadmissible evidence. Therefore, I respectfully insist to the court that such action does not constitute reversible error.

The question asked by the court of Davis, the police-
man, who was a state's witness, and which question I
have already quoted to the court, is, I concede, techni-
cally a leading question. As a practical proposition in
this case, however, this question asked by the circuit
judge becomes entirely an immaterial matter in the case
so far as the question of reversal of the judgment is con-
cerned, in view of the fact that Davis had already stated
in his examination in chief, that he has sent these detec-
tives to the defendant's house after dark on that day. It
had been admitted moreover without objection by the de-
fendant except upon the whole general objection that
Davis' testimony was incompetent, a proposition which I
have already discussed: but the proposition now for con-
sideration is not of course whether Davis' testimony on
the whole was competent, but the precise point to be con-
sidered is whether or not the propounding by the court
by proper and legal question to this witness a question,
was itself, and indeed above all other considerations in
the case, reversible error. I submit that it was not, be-
cause this same testimony had already been admitted in
the case; that the whole testimony therefore, resolves it-
self not into a question whether the court has asked a
leading question, but whether the body of Davis' testi-
mony was competent. Counsel has cited section 793 of
the Code on this question, which is a statutory prohibi-
tion that prevents a judge from summing up or comment-
ing on the testimony, or charging the jury as to the
weight of evidence, and which limits the judge in his
instructions to written requests made by the parties in
the case. This question by the trial judge cannot be re-
garded as a summing up or a comment on the evidence in
the record, nor can it be treated as any instruction on the
part of the judge of the weight of the evidence. The pro-
position that a trial judge must be careful and guarded
in his language and conduct in the presence of the jury
in order to avoid prejudice to either side is a familiar

doctrine or principle of the law, but in this case, aside from any technical view of the point made, I submit that an answer to the argument of counsel is that this testimony had already been introduced into the case in Davis' testimony. Therefore, the question argued by counsel as to the alleged leading question by the court is purely theoretical and academic, and should not constitute a basis for the reversal of the case.

Learned counsel for appellant argues the proposition that the appellant did not have a fair trial because of the fact that sheriff was under the law, as it now stands, pecuniarily interested in fines that are imposed on criminals of this character, and that he had paid the detectives out of his own pocket to work up the evidence; that he had summoned the jury in the case, and that the sheriff was active in assisting the prosecution of the case. Of course, the doctrine is universal and conceded as an abstract proposition that the jury should be preserved from all extraneous influences, so as to insure a fair and impartial verdict. This was said in the case of *Lewis* v. *State,* 9 S. & M. (Miss.) 115; 43 Miss. 364.

But the precise application of the doctrine as laid down by the recent decisions of this court, is that it must be shown that improper influences operated upon the jury in a case in order to vitiate their verdict. The rule is that as announced by this court in repeated cases, which is, that, where the jury has been permitted to separate, or has been exposed to improper or malign influences, that the verdict has been vitiated, but it has been expressly held that where the facts and circumstances fail to show that the jury was improperly influenced, or where the facts show in point of fact that they were not improperly influenced, notwithstanding a supposed exposure, that the verdict will not be set aside on that ground. In this case, the jury was evidently kept together, and so far as the record in this case is concerned, they were preserved free from extraneous influences.

The fact that the sheriff summoned the jury in the case; the fact that the law gave him a part of the fines; the fact that he rendered assistance to the prosecution; are not facts, which, I submit to the court are *per se* vitiating facts, or which throw suspicion around the verdict of the jury.

SMITH, C. J., delivered the opinion of the court.

Appellant, having been convicted of selling intoxicating liquors, appealed to this court, and his conviction was affirmed at a former day of this term. His counsel now suggests that we erred in so doing, for the reason that the court below committed manifest error in permitting the introduction of certain testimony offered by the state.

Appellant was convicted on the testimony of two detectives employed by the sheriff for the purpose of ferreting out the commission of crimes of this character. They testified that they went to the house of appellant, and were met at the door by his wife, Carrie, and told her they wished to purchase some whisky; that she returned into the house, and shortly afterwards appellant himself appeared with two half pints of whisky, for which they paid him the sum of one dollar and twenty-five cents. A Mr. Davis was then introduced by the state, and after he had testified that he had requested these detectives to go to this house, he was permitted, over the objection of appellant, to answer the following questions: "Q. For what purpose did you send them there? A. I sent them up there to catch Carrie. Q. For what purpose; to catch Carrie doing what? A. To get a sale of whisky or beer on her." The "Carrie" referred to is appellant's wife. Appellant denied having made this sale; he and one other witness testifying that he was at a place other than his residence at the time these detectives claimed to have purchased the whisky. Conceding, but not deciding, that this testimony was incompetent, and ought not to have been admitted, its admission can by no

stretch of the imagination be said to have resulted in a miscarriage of justice.

Counsel for appellant very vigorously attacks the principle of harmless error here applied and embodied in rule No. 11 of this court (59 South. ix), and quotes extensively from an address delivered by the president of the Mississippi state bar association at its recent meeting, wherein this rule is referred to as judicial legislation, revolutionary in character, and the statement made that "the rule, enforced and applied literally, would produce a condition of judicial tyranny from which the state would revolt." The source from which this criticism emanated entitles it to more serious consideration than it would otherwise merit, for the rule criticised comes to us from the common law, and in slightly different language is now enforced in many jurisdictions by virtue of statutes, rules of court, or judicial decision, including the courts of that country from which our jurisprudence is derived, and in addition has been approved by various bar associations, including the American and our own state bar association. The rule referred to is as follows: "No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for error as to the matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice."

Counsel does not advise us what, in his judgment, the rule in this matter ought to be; but we presume that he approves that rule which Mr. Wigmore terms the "Exchequer heresy," for the reason that it was first announced in the English Court of Exchequer, and which is "that an error of ruling creates *per se* for the excepting and defeated party a right to a new trial;" for part of the language quoted from this address by him with approval is as follows: "The true rule must be that a miscarriage of justice has already resulted when the case

has not been tried according to law, and the only business of the supreme court of Mississippi has heretofore been and ought to be to see that this error is corrected. Any other rule will bring chaos and confusion worse confounded.''

Prior to the decision of the case of *Crease* v. *Barrett,* in 1835, by the Court of Exchequer, reported in 1 C. & M. 918, the orthodox common-law rule on this subject was that an erroneous ruling of the character here under consideration ''was not sufficient ground for setting aside a verdict and ordering a new trial, unless upon all the evidence it appeared to the judges that the truth had thereby not been reached.'' 1 Wigmore on Evidence, section 21, and authorities there cited, particularly *Tyrwhit* v. *Wynn,* 2 Bar. & Ald. 637. In *Crease* v. *Barrett* the Court of Exchequer ''announced a rule which in spirit and in later interpretation signified that error of ruling created per se for the excepting and defeated party a right to a new trial. The new Exchequer rule was speedily accepted in the other courts; and for something more than a generation it remained the law of England, until it was reformed away, for civil causes, in 1875.'' 1 Wigmore on Exchequer, section 21. This heresy also early obtained recognition in America, and is probably still the rule in a majority of the states. The many miscarriages of justice, of which its enforcement was undoubtedly the cause, have at last brought it into disfavor, and it has now been repudiated in many jurisdictions, the courts of which have returned to the orthodox English rule, either voluntarily or by legislative command.

This matter seems first to have come under the consideration of the highest appellate tribunal of this state in 1821, in the case of *Taylor* v. *Sorsby,* Walk. 97, wherein, among other things, it was said: ''New trials are frequently necessary, and sometimes indispensable, for the purpose of obtaining the ends of substantial justice. But the important right of trial by jury should not be dis-

turbed, unless upon the most unequivocal evidences of injustice to the party who complains; otherwise, the rights of the jury would be literally transferred to the courts, and they would, instead of the jury, become the triers of facts, in contravention of one of the leading features clearly expressed in our political association. However, if it is manifest to a reasonable certainty that justice has not been done, the courts will always interfere, and give the party an opportunity of having his cause reexamined by a second jury.'' The rule thus announced differs from the one now under consideration only in the language in which it is couched; for the word ''miscarriage'' simply means ''a failure, or a case of it,'' and the phrase ''miscarriage of justice'' simply means ''a failure to secure justice.'' Webster's International Dictionary.

Unfortunately, however, this Exchequer heresy soon obtained a foothold here, and in 1855, in *Jackson* v. *Jackson,* 28 Miss. 674, 64 Am. Dec. 114, it was said ''that the correct rule is that, when error of law manifestly appears, the presumption of law is that it was to the prejudice of a party complaining of it, and that the judgment will be reversed by reason of it, unless it appear by the record that it did not operate to the injury of the party complaining.'' This presumption of prejudice from the commission of error seems gradually to have become more conclusive, as will appear from *Harper* v. *Tapley,* 35 Miss. 506; *Josephine* v. *State,* 39 Miss. 648; *Solomon* v. *Compress Co.,* 69 Miss. 319, 10 South. 446, 12 South. 339, and *Foster* v. *State,* 70 Miss. 755, 12 South. 822, and reached its apotheosis in *Lipscomb* v. *State,* 75 Miss. 559, 23 South. 210, 230, wherein it seems to have been held that this court has nothing whatever to do with the correctness of the result reached by the jury in the court below, but must in all cases reverse for the commission of an error ''of such character as that the jury itself might have been influenced by it.'' 75 Miss. 599, 620, 23 South. 221.

After the decision of this case, however, this court continued to decline to reverse judgments, notwithstanding the commission of error by the court below of the character here under consideration, when it appeared from the whole record that justice had been done; and in *Rector* v. *Outzen,* 93 Miss. 256, 46 South. 408, it seems to have returned to the earlier and orthodox rule, for it is there said that "in order to secure a reversal it must be shown that there was an error and that the error was prejudicial." Until it is shown that the party against whom an error was committed has failed to obtain justice, it cannot be said that he has been prejudiced—that is, injured or damaged—by its commission.

The objections generally urged against the rule now under consideration are that by acting upon it the court invades the province of the jury, and that its frequent application would cause the rules of evidence to be less carefully considered. The second reason may have some foundation in fact, but we must remember that the rules of evidence are not an end in themselves, but merely a means to an end, and when the end sought has been reached it is folly to reject it merely for the reason that the jury arrived at it in a manner other than that contemplated by the law. The first reason is wholly without merit, for by applying it an appellate court, instead of invading the province of the jury, upholds it to the full extent in its prerogative of determining what the truth of the matter in controversy is, and declines to interfere unless it clearly appears that it has failed to correctly discharge this duty.

This court is one of appellate jurisdiction only, and its sole duty is to correct errors made in the courts below which have operated to the prejudice of the parties complaining thereof, and until both error and prejudice resulting therefrom are shown by the record it should not and will not interfere with the course of justice. It will continue to protect litigants in all of their fundamental

rights, and will see, so far as in its power lies, that full and complete justice is administered to them. Nevertheless it must be thoroughly understood, in the language used by Judge WHITFIELD in his dissenting opinion in *Lipscomb* v. *State,* 75 Miss. 617, 23 South. 228, "that this . . . tribunal is not a helpless prisoner, bound in the fetters of some supposed hard and fast rule requiring it to reverse ·cases where, first, erroneous instructions have been given; or, second, proper instructions have been refused; or, third, competent testimony has been excluded; or, fourth, incompetent testimony admitted; or, fifth, improper argument has been allowed; or, sixth, the trial court has erred in its rulings on the pleadings—on the ground, merely, that such action of the court of the one kind or the other, constitutes error in law merely," and that for the commission of such an error the judgment of a trial court will be reversed only when it "affirmatively appears from the whole record that such judgment has resulted in a miscarriage of justice."

Suggestion of error overruled.

*Suggestion overruled.*